John MIKUS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 659, Docket 34079.

United States Court of Appeals, Second Circuit.

Argued April 24, 1970.

Decided Nov. 6, 1970.

F. Mac Buckley, Asst. U. S. Atty., Hartford, Conn. (Stewart H. Jones, U. S. Atty., Hartford, Conn., of counsel), for appellee.

Howard T. Owens, Jr., Bridgeport, Conn., for appellant.

Before MOORE and SMITH, Circuit Judges, and POLLACK,* District Judge.

MOORE, Circuit Judge:

John Mikus appeals from his conviction on trial to the jury in the District of Connecticut for armed bank robbery. Six issues are presented for our consideration: (1) whether appellant was deprived of an impartial jury; (2) whether the film of the bank robbery shown to

* Of the Southern District of New York, sitting by designation.

the jury was properly authenticated prior to its introduction into evidence; (3) whether being required to stand up in court for the purposes of identification and comparison by a Government witness violated appellant's privilege against self-incrimination; (4) whether Government questioning of appellant relating to his possession of a gun at a time proximate to the bank robbery was prejudicial error; (5) whether the testimony of an investigator from the Immigration and Naturalization Service regarding the circumstances of his first meeting with appellant constituted prejudicial error; and (6) whether there was sufficient evidence to support appellant's conviction. We find no error and affirm the judgment below.

On January 15, 1968, the Lincoln National Bank's Long Ridge Branch, in Stamford, Connecticut, was robbed of approximately $6,200 by two armed men wearing dark, solid colored ski masks. One of the holdup men had a heavy Slovak accent. At the time of the robbery, there were two employees on duty, Mrs. Alice M. McMahon and Mr. Joseph Matula, both of whom testified at the trial. One of the men stood in front of Mrs. McMahon's teller counter with a gun, while the other vaulted over the counter to get the money from Mr. Matula. The robber with the accent had a brown paper grocery bag with a red "A & P" label on it, into which he instructed Mrs. McMahon to put the money entrusted to her. Removing the "bait money" from her teller drawer, she tripped an alarm device and a movie camera, positioned on a wall near the ceiling of the bank and aimed at the tellers' windows. The developed film showed the two men in dark masks performing the robbery and indicated that one of the men was bent over slightly as he stood at the window of Mrs. McMahon. She testified that the robber looked about 5′ 4″ while Mr. Matula established the height of both robbers at about 5′ 10″—the height of appellant Mikus. The film further showed one robber carrying a paper grocery bag with what probably was an "A & P"

trademark on it. Shortly after the bank robbery, a stolen automobile was found abandoned on a nearby expressway. In the car, police found a dark green ski mask and an "A & P" bag. Six fingerprints identified as those of appellant Mikus were found on the bag, and a thumbprint of his co-defendant (whose trial was severed because he was in a mental institution at the time of trial) was also found in the car. Further down the expressway, on the route between the bank and the abandoned car, a second dark green ski mask was found near the roadway.

The only positive evidence linking Mikus directly with the robbery consisted of the fingerprint evidence, his height and his Slovak accent. Testifying in his own behalf, appellant offered an unsubstantiated and apparently false alibi for his whereabouts on the date and at the time of the crime. He also denied knowing the co-defendant, but a witness testified that he had seen the two co-defendants on a couple of occasions eating, drinking and talking together in his restaurant prior to the robbery.

■ Appellant first contends that the trial judge's refusal to excuse three veniremen for cause resulted in the deprivation of a fair and impartial jury trial, which constitutes reversible error under the Sixth Amendment. We do not agree. The trial was held during the summer months, and a large number of veniremen, whose summer vacation time had arrived, were excused from duty. The court became concerned that with only 26 prospective jurors remaining, from which a jury had to be obtained, the trial could not proceed as scheduled. It appears to be appellant's theory that had the three been excused for cause, his ten peremptory challenges could have been exercised to cut the venire down to 13 and thus force the Government to waive all but one of its six peremptory challenges or to postpone the trial. However good the strategy may have appeared to appellant's trial counsel, there are no allegations made before this court of specific instances of prejudice to ap-

pellant's cause; no juror's name is cited, for example, to indicate that but for the trial judge's rulings, appellant was forced to accept a juror against his interests.[1]

The three prospective jurors in question were, respectively, the wife of a bank board chairman, a former local police officer who had served for some six years in that capacity thirteen years earlier, and the wife of a state police officer, who, if empaneled, would hear the testimony of other state troopers. In response to court inquiry, each stated that she or he felt able to render a fair and impartial verdict. Appellant's trial counsel, then asked by the court if he had any supplementary questions to ask the veniremen on voir dire, posed none. The gravamen of the appeal on this point, therefore, must be that the mere status, past or present, of the three prospective jurors *per se* constituted sufficient cause for their being excused from venire duty in appellant's trial. We find this contention to be without merit in this case.

The Supreme Court has stated that

"[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, (1961).

The question of juror impartiality presents a mixed question of law and fact, Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244 (1878), and the test therefore is "whether the nature and strength of the opinion formed are such as in law necessarily * * * raise the presumption of partiality." *Id.* Moreover,

"[t]he affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside." Reynolds v. United States, *supra,* quoted in Irvin v. Dowd, *supra.*

On appeal, the findings of the trial court with respect to juror impartiality will be set aside only where the prejudice to a defendant is shown to be "manifest." Reynolds v. United States, *supra;* Irvin v. Dowd, *supra,* 366 U.S. at 723–724, 81 S.Ct. 1639 and cases cited therein. After independently evaluating the individual voir dire testimony of the three veniremen in the light of the above standards, Irvin v. Dowd, *supra,* at 723, 81 S.Ct. 1639, we conclude that there is nothing in the record to indicate that any of the three were manifestly partial.

We are referred by appellant's counsel to Jackson v. United States, 129 U.S. App.D.C. 392, 395 F.2d 615, 617–618 (1968) and to United States ex rel. De Vita v. McCorkle, 248 F.2d 1 (3d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957). Without approving the two decisions of the District of Columbia and Third Circuits, respectively, we find them clearly distinguishable from the instant case, where none of the jurors had had a strikingly "unique similarity between his experience [as a member of a fatal love triangle or as a robbery victim, respectively] and this case," and where none had failed to respond truthfully to questions regarding their ability to serve as impartial jurors. As to the wife of the bank board chairman, in particular, we are cited to Sims v. United States, 132 U.S.App.D.C. 111, 405 F.2d 1381 (1968) (per curiam), where the District of Columbia Circuit, in a footnote, held that on retrial of the three defendants charged with the felony murder of a taxicab driver during an attempted robbery, "jurors should be excused for cause if they are, *or are related to,* taxicab drivers (emphasis add-

---

1. The three veniremen in question were excused by appellant's exercise of his peremptory challenges.

ed)," 405 F.2d at 1384 n. 5, citing *Jackson* and *McCorkle, supra.* Even assuming, *arguendo,* the correctness of the two last-mentioned decisions, the basis for the *Sims* holding goes so far beyond the special facts of the two cases cited as precedent therefor that we are constrained to reject *Sims* out of hand as persuasive authority in this case. To do otherwise would be to overrule sound decisions by courts of this Circuit. See, e.g., United States v. Johnson, 401 F.2d 746, 747 (2d Cir. 1968) (per curiam) (challenge for cause to be within the trial court's discretion where prospective juror was an employee in trust department of a bank different from that robbed in that case).

■ The mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial. United States v. Wood, 299 U.S. 123, 140 n. 9, 57 S.Ct. 177, 81 L.Ed. 78 (1936); Cavness v. United States, 187 F.2d 719, 723 (9th Cir.), cert. denied, 341 U.S. 951, 71 S.Ct. 1019, 95 L.Ed. 1374 (1951); Marshall v. United States, 355 F.2d 999, 1009 (9th Cir.), cert. denied, 385 U.S. 815, 87 S. Ct. 34, 17 L.Ed.2d 54 (1966). *A fortiori,* the former police officer who had ceased his public law enforcement work in 1956 was more than sufficiently insulated against an attack of presumptive prejudice, as was the wife of the state trooper. Cf. United States ex rel. Cooper v. Reincke, 219 F.Supp. 733, 741 (D. Conn.1963), aff'd, 333 F.2d 608 (2d Cir.), cert. denied, 379 U.S. 909, 85 S.Ct. 205, 13 L.Ed.2d 181 (1964) (juror empaneled who was the wife of elected police commissioner and who knew several members of the city's police force and the county investigator).

■■ This court does not choose to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where, as here, there is no showing of actual bias or

prejudice. See United States v. Haynes, 398 F.2d 980, 983–986 (2d Cir. 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124 (1969).

> "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." United States v. Wood, *supra,* 299 U. S. at 145, 146, 57 S.Ct. at 185.

Rather, this court adheres to the principle that a defendant must "raise a contention of bias from the realm of speculation to the realm of fact." The trial court, in turn, when empaneling a jury, "has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges therefor." Dennis v. United States, 339 U.S. 162, 168, 171–172, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950).

■ In this case, as in the case of United States v. Palumbo, 401 F.2d 270, 275 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969), the trial court examined the prospective jurors in question to make sure that they were in no way prejudiced. Upon concluding that they were not, he, as the trial court below, should be upheld. Moreover, as in United States v. Haynes, *supra,* 398 F.2d at 984, the trial court afforded defendant's counsel the opportunity at the time of voir dire to pose additional questions, an opportunity which counsel both here and in *Haynes* declined. "Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury," Dennis v. United States, *supra,* 339 U.S. at 171–172, 70 S.Ct. at 523. We are satisfied that appellant's trial counsel was given that opportunity and, as noted earlier, we are unable to say that the trial court erred in not finding manifest prejudice, which would have raised the presumption of partiality upon which appellant is necessarily dependent.

■ Appellant's next contention is that a proper foundation was not laid for the introduction into evidence of the motion picture film which recorded the bank robbery for which he stood accused. We believe that the testimony of one of the bank tellers, Mrs. McMahon, constituted adequate authentication to warrant the film's admission. Prior to the first of four showings of the film to the jury, the Government elicited testimony from Mrs. McMahon as to the area to which the camera was directed, the means of activating the camera, her own activation thereof and her own prior viewings of the film sought to be introduced. After this preliminary testimony, she testified that the film was a fair and accurate representation of the occurrences inside the bank during the time of the January 15, 1968 robbery. Mrs. McMahon, while the jury was dismissed, was again shown the film, and she repeated her last statement above. The trial court then admitted the film into evidence, over objection, the jurors were called back and Mrs. McMahon once again stated for their benefit her belief in the fairness and accuracy of the depiction they were about to view on the screen. After the first showing to the jury, Mrs. McMahon again repeated her statement.

■ While we agree that motion pictures, as demonstrative evidence, must be authenticated, 3 Wigmore on Evidence § 798a (1940), at 203, we cannot agree that the most stringent requirements as to their admissibility urged upon us by appellant's counsel should be made applicable to this case. See Kennedy, Motion Pictures in Evidence, 27 Ill.L.Rev. 424–427 (1932), quoted in 3 Wigmore, *supra;* Note, Demonstrative Evidence—Admissibility of Motion Picture and Wigwag Signal, 47 Ia.L.Rev. 1138 (1962). The film in question was the purported recordation of the actual occurrences involved in the trial, and not a reconstruction thereof. Therefore,

> "[w]here the moving picture is taken *without artificial reconstruction, i.e.,* at the time and place of the actual

event (a possibility not infrequent), it lacks the above element of weakness [i.e., 'special risk of misleading'] and is entitled to be admitted on the same principles as still photographs [emphasis in the original]." 3 Wigmore, *supra;* see also Kennedy, *supra,* at 424–25.

We are urged by appellant's counsel, who analogizes the motion picture with a tape recording, that highly detailed, effectively "expert," authentication was necessary in order to prevent dangers of cutting, editing and other doctoring of the film, which might have created misleading and prejudicial impressions in the minds of the jurors. It is contended that it was necessary to call the person(s) responsible for installation and maintenance of the bank camera to testify as to his competence and his knowledge of the particular camera mechanism, film, speed, exposure, development and possible editing of the films. See *Kennedy, supra.* This line of argument was expressly presented to and correctly rejected by the Sixth Circuit in United States v. Hobbs, 403 F.2d 977, 978–979 (6th Cir. 1968), as creating "unrealistic roadblocks" to the introduction of important objective evidence:

> "Even where an occasional qualified witness may be available to testify as to such details such testimony would obviously be irrelevant and immaterial. What is material is what the rankest box camera amateur knows, namely that he 'gets' what he sees. We thus come full circle to the judicial test * * * whether the proffered photography is an accurate representation of the scene depicted."

Mrs. McMahon testified that the film showed exactly what happened as it would appear from the vantage point of the camera. It is difficult to imagine that cutting and splicing could have affected the film's representation of the robbers, their guns, masks and the "A & P" bag. The principal use of the film apparently was to show that Mrs. McMahon could easily have thought one robber was shorter than he actually was

by virtue of his bending over. To produce in the film an inaccuracy in this respect would have required the refilming of the scene with an actor bending over and the splicing of the new film onto the original. Whereas a sound tape could be damagingly altered by editing in and/or out portions of a conversation, to have altered the bank robbery film to appellant's disadvantage would have required adding a fabricated sequence, along the lines suggested above. Appellant makes no claim that anything of the sort was done here, and we cannot imagine any possible exculpatory sequence which might have been edited out of this simple film. We conclude, therefore, that appellant's contention on this point is without merit.

We are satisfied that Mrs. McMahon's testimony adequately made out the requisite elements for authenticating the film, see Kortz v. Guardian Life Ins. Co., 144 F.2d 676, 679 (10th Cir.), cert. denied, 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584 (1944), and that the trial court was within its discretion in allowing the film into evidence.

Appellant asserts that his constitutional privilege against self-incrimination was violated when, on two occasions, during the course of trial, he was called upon by the Government to stand up for purposes of identification and comparison. This contention is clearly without merit. Bypassing defense counsel's failure to make a timely objection to the conduct questioned for the first time on appeal, United States v. Indiviglio, 352 F.2d 276, 279 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S. Ct. 887, 15 L.Ed.2d 663 (1966), and further bypassing the fact that defense counsel had asked appellant on two earlier occasions to stand up for the same purposes objected to here, when Government witness Mrs. McMahon was under cross-examination, it is well established that a defendant may be compelled to stand up during trial for purposes of identification and comparison, States ex rel. Stovall v. Denno, 355 F.2d 731, 736 (2d Cir. 1966) (en banc), aff'd, 388 U.S.

293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and that such compulsion results in non-testimonial or non-communicative evidence given by a defendant which is not protected by the Fifth Amendment privilege against self-incrimination, Schmerber v. California, 384 U.S. 757, 761, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

Immediately after the Government rested, appellant Mikus took the stand to testify in his own behalf. Defense counsel on direct examination brought out the existence of a prior conviction for aggravated assault. The prosecutor on cross-examination went over the nature of the crime, the sentence and the service of sentence, which all concede was proper. See McCormick on Evidence § 43 (1954), at 92–93. Mikus was then asked if he had "ever had a gun." Without objection, Mikus volunteered that a gun was involved in the prior crime for which he was convicted, explaining that the gun wasn't really his. The record shows that the question as propounded was not directed at improperly exploring the details, or "aggravating circumstances," of the prior felony, *McCormick, supra,* but represented an attempt to discover whether Mikus possessed a gun which could have been used in the bank robbery. After discussion among court and counsel, the prosecutor dropped the subject of the prior conviction and began asking questions relating to Mikus' subsequent possession of a gun. Specifically, he asked whether Mikus had shown a gun to a Miss Daviau on a specific date, and he next asked whether Mikus had asked a Mr. Horvath to loan him a gun on a second specific date. The defense asked for a mistrial, because, having introduced the suggestion that Mikus had a gun on these two occasions, the prosecution could not produce Miss Daviau or Mr. Horvath. Mikus denied both incidents, but the prosecutor's suggestion that they had occurred remained in the record.

Apparently conceding that the prosecutor's questions above, without evidence to rebut the denials, were improp-

erly allowed to be answered, the Government relies on United States v. Indiviglio, *supra,* for the proposition that a timely objection could have prevented this entire line of questioning after the first question was broached, and that defense counsel's failure so to object requires the finding of a waiver of the objection on appeal. Appellant's brief does not argue the denial of his motion for mistrial, nor does he explain the absence of any objection to the improper questions at the time they were asked. He does not make the argument that these questions amounted to inadmissible prosecutorial "testimony" that Mikus had, in fact, possessed a gun at a time proximate to the robbery, which seems to be the most damaging impropriety of the entire line of questioning involved. This court could, in its discretion, notice as "plain error" the impropriety of the questioning relating to appellant's possession of a gun, under Rule 52(b) of the Federal Rules of Criminal Procedure. In view of appellant's failure to object at all to this line of questioning until it was completed, his failure to argue the point here, and, as will be discussed below, the ample sufficiency of the evidence upon which appellant could have been convicted without proof of possession of a gun at the time of the robbery, however, we decline to notice "plain error." United States v. Indiviglio, *supra.*

Over objection, an investigator for the Immigration and Naturalization Service (I.N.S.), Mr. Ashe, was called by the Government to testify in part that I.N. S. records showed Mikus to have been born in Yugoslavia. After argument as to whether the investigator was custodian of the Mikus records, the trial court suggested the question of whether Ashe knew the defendant. It was elicited by the trial court that the circumstances under which Ashe came to know Mikus were that he had first met appellant in a Norwalk, Connecticut police station in 1963 and had interviewed him regarding his alienism. Defense counsel then objected and moved for a mistrial after the jury was excused. The motion was denied.

Defense counsel seems to have objected to the implication that because the I.N.S. agent first met appellant in a police station, the jury would conclude that the defendant was a bad character with an unfavorable history, cf. United States v. Dichiarinte, 385 F.2d 333, 337 (7th Cir. 1967), which evidence no doubt would be inadmissible. See Wright, Federal Practice and Procedure—Crim. § 416 (1969). We do not believe, however, that the jury necessarily or reasonably related the Norwalk station meeting with appellant's conviction on the aggravated assault charge. Although Ashe testified later at trial, no further mention was made of the 1963 meeting, or of any other basis for connecting the meeting with an arrest or crime. There is also no claim that the I.N.S. agent deliberately volunteered "the circumstances" of his first meeting with appellant in order to prejudice him before the jury. We conclude, therefore, that the incident objected to was of an innocuous and unintentional nature, United States v. Schwartz, 398 F.2d 464, 470 (7th Cir. 1968), cert. denied sub nom. Pyne v. United States, 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed.2d 705 (1969), and that the motion for mistrial, addressed to the sound discretion of the trial court, was properly denied. United States v. Cioffi, 242 F.2d 473, 476 (2d Cir.), cert. denied, 353 U.S. 975, 77 S.Ct. 1060, 1 L.Ed.2d 1137 (1957).

We believe that there was substantial evidence to support appellant's conviction. Not only were appellant's fingerprints found on an "A & P" bag, which testimony and the film showed to have been used in the bank robbery, a co-defendant's fingerprint was also found on the bag. The grocery bag was found in a stolen car approximately a half-mile from the scene of the robbery, along with an inverted ski mask with tassel, like those which testimony and

the film indicated were worn in the robbery. Moreover, a second, identical, mask was found along the route which the stolen car would have taken in going from the bank to the location where it was found. The bank tellers testified that one of the robbers had a Polish or Slovak accent. One of the tellers, Mr. Matula, testified that he was familiar with such accents from his experience with his Czech father, who used to say the same words which the robber with the heavy accent had spoken.

After his arrest, appellant stated to an F.B.I. agent that he did not know the man accused of being the second bank robber. A restaurant owner placed appellant and his co-defendant together in his restaurant on several occasions. Appellant's denial could therefore be taken as "circumstantial evidence of guilty consciousness [which] has independent probative force." United States v. Smolin, 182 F.2d 782, 783–786 (2d Cir. 1950).

Appellant's employer testified that appellant did not appear for work either on the day of the robbery or on the following day. Appellant claimed that he did not work on these two days because he had gone to the I.N.S. on the day of the robbery and had to stay overnight due to his arrival in the late afternoon and a snow storm which had forced the offices to close early. An I.N.S. official testified that the offices had closed at their normal hour on the day in question. On the basis of appellant's prior conviction and on the basis of the testimony contradicting appellant's story, the jury was entitled to give little credence to, and could have inferred consciousness of guilt from, the alibi, if it considered the alibi incredible and patently false. United States v. Fabric Garment Co., 262 F. 2d 631, 639 (2d Cir. 1958), cert. denied, 359 U.S. 989, 79 S.Ct. 1117, 3 L.Ed.2d 978 (1959).

The judgment below is affirmed.