William R. PHILLIPS, Petitioner,

v.

Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent.

No. 79 Civ. 1782.

United States District Court,
S. D. New York.

March 13, 1980.

William M. Kunstler, New York City, for petitioner.

Robert M. Morgenthau, Dist. Atty. for New York County, by Jerrold Tannenbaum, Robert M. Pitler, Asst. Dist. Attys., New York City, for respondent.

PIERCE, District Judge.

## OPINION AND ORDER

This petition for a writ of habeas corpus presents this Court with the serious question of whether a defendant charged with capital crimes in state court can receive a *fair trial* where one of the members of the jury, during the course of the trial, sought some benefit from the prosecutor's office and where this fact became known to the prosecutor during the trial but was not communicated to defendant's counsel or to the court until after a verdict of guilty had been returned.

Petitioner William R. Phillips was convicted after a trial before a jury in State Supreme Court, New York County, on November 21, 1974, on two counts of murder and one count of attempted murder. He is presently serving concurrent sentences on those charges of up to a life term of imprisonment. He has petitioned for a writ of habeas corpus pursuant to sections 2241 and 2254 of Title 28, United States Code. In support thereof, he contends, first, that he was denied his constitutional right to a trial by an impartial jury and, therefore, to due process of law in that a member of the jury had applied for employment with the prosecutor's office during the course of the trial, which application, to the knowledge of the prosecutor, was still pending at the time the jury rendered its verdict against him. He further asserts that a second juror, while serving on the jury in this case, had agreed to testify on behalf of the prosecution in another, unrelated criminal action in exchange for immunity from prosecution for himself, petitioner not having been informed of this fact until the end of the prosecution's case against petitioner. Finally, petitioner contends that a tape recording of a conversation in which he was a participant should not have been admitted into evidence at his trial because he had previously been granted transactional immunity with respect to that conversation.

In the discussion that follows, petitioner's second and third contentions will not be addressed since this Court finds, with respect to his first contention, that the fundamental constitutional requirements of a trial before an impartial jury and of due process of law were denied to petitioner based upon the undisputed fact that a juror filed an application for a job in the prosecutor's office after being selected to serve on the trial jury in this case, which application was still pending at the time the jury rendered its verdict. The Court notes that the prosecuting attorneys became aware of this information during the trial but did not reveal it to either the defendant or the trial court until after a verdict was rendered. The Court notes further that this issue might well have been avoided if the prosecuting attorneys had timely informed the trial judge of this matter since alternate jurors were available to replace this juror/job applicant before deliberations began.

## FACTS[1]

On March 29, 1972, petitioner was indicted on charges of murder and attempted murder. Thereafter on June 28, 1972, the first trial of petitioner on these charges was

---

1. During the post-trial hearings before Justice Harold Birns in state court on petitioner's motion to vacate the verdict of the jury on the grounds of jury and prosecutorial misconduct, the testimony of all of the persons involved in the incidents set forth in the petition before this Court was taken. Inasmuch as the parties are in substantial agreement regarding the events in controversy, a separate hearing was not held by this Court on the present petition. The events described herein have been established from the record of the criminal proceedings against the petitioner in state court, including post-trial hearings.

commenced in State Supreme Court, New York County. However, on August 9, 1972, the jury informed the court that it was unable to reach a verdict, and a mistrial was declared. Petitioner's second trial before a jury was commenced on September 16, 1974, before Justice Harold Birns. On November 21, 1974, the jury returned a verdict convicting petitioner of two counts of murder and one count of attempted murder. Both trials were prosecuted by the New York County District Attorney's Office.

During the course of the second jury trial, one of the jurors, John Dana Smith, was informed by one Rudy Fontaine of possible employment opportunities in the Major Felony Program of the New York County District Attorney's Office. At that time, Fontaine was a uniformed court officer of the same state court in which petitioner was on trial, but was not involved in the ongoing proceedings against the petitioner. Fontaine knew that Smith had an interest in law enforcement; he also knew that Smith was a juror in the Phillips trial. During the jury selection process Smith had revealed that he was interested in law enforcement and had applied for a position with the federal Drug Enforcement Administration.

With Smith's consent, Fontaine began to inquire about employment opportunities with the New York County District Attorney's Office on Smith's behalf, as well as his own. He spoke to Michael Mulderrig, an investigator in the District Attorney's Office whom he knew, about applying for a position. Fontaine was told that he should apply for a position by submitting a letter and a resume to the District Attorney's Office by hand or by mail. The record of this matter, including the post-trial hearings held by Justice Birns at which the testimony of these persons was taken, is inconclusive as to whether Fontaine mentioned to Mulderrig either Smith's name or the fact that Smith was a juror in a pending criminal action.

Fontaine also spoke to a jury warden for the New York State Supreme Court, one Mario Piazza, to inquire if he knew where an employment application should be submitted. Piazza in turn spoke to an assistant district attorney, one John Lang, and was told that employment applications should be sent to the District Attorney's Office. Piazza did not know the names of the prospective applicants at that time and did not, therefore, mention Smith's name. However, he later met Smith, while petitioner's trial was underway, at a lunch with Fontaine.

On or about October 22, 1974, Smith drafted a letter and resume pursuant to Fontaine's instructions.[2] He gave these to Fontaine in an unstamped envelope for delivery to the District Attorney's Office. Smith stated at the post-trial hearings before Justice Birns that he assumed that Fontaine had a personal contact in the District Attorney's Office and that Fontaine would personally hand-deliver the envelope to that person when Fontaine submitted his own application. (Hearing Transcript at pp. 71–72). He further stated that he did not expect that Fontaine would influence the evaluation of his application through any of Fontaine's contacts within the District Attorney's Office. He did later, however, seek the help of a former job supervisor, Wallace Reilly, *infra*, whose acquaintance with members of the District Attorney's Office, Smith hoped, would be beneficial. (Hearing Transcript at p. 73).

Fontaine thereafter personally delivered his own application to the District Attorney's Office. However, when he offered the envelope containing Smith's application, he was told that it should be addressed and mailed to Richard Kuh, the District Attorney. Fontaine subsequently stamped and mailed the envelope as directed.[3]

2. The letter itself did not indicate that Smith was a member of the Phillips' jury. It was addressed to District Attorney Richard Kuh, and dated October 23, 1974. It stated:

"I understand that a Federal Funded investigation unit is being formed in your office to investigate major felonies. I wish to apply for a position as an investigator.
Attached is my resume. Letters of recommendation will be furnished upon request.
Thank you for your consideration."

3. The letter with resume was received by the District Attorney's Office on or about October

Several days later, Fontaine met with Smith and Piazza for lunch, at which time Piazza informed Fontaine about Smith's application having been submitted. That afternoon or the next day, Piazza called Fontaine and told him that an Assistant District Attorney by the name of Sudolnik was responsible for reviewing applications for employment in the Major Felony Program for which Smith had submitted an application and that Smith should call her. Fontaine apparently relayed this information to Smith. It appears that, at the time of his last telephone conversation with Fontaine, Piazza was not aware that Smith was a juror in an ongoing criminal proceeding in state court.

In late October or early November, 1974, after Smith's employment application had been submitted, Assistant District Attorney Holmes was approached by Fontaine and informed that a person serving as a juror in the Phillips case had applied for a position with the District Attorney's Office. He may also have been asked if he would do something about the application, to which request, Holmes contended at the post-trial hearings, he initially indicated that he would check and see if an application had been filed. However, Holmes further contended, when he realized that the applicant was a juror, he became alarmed and told Fontaine that he would not contact Smith and that the application would not be processed. Fontaine contends that Holmes stated that he did not think that it was improper for a juror to apply for a position with the District Attorney's Office. Regardless of what was actually stated, it is clear from the record that Fontaine informally inquired about Smith's application. This event apparently took place both without Smith's actual knowledge and before the verdict was rendered in the state criminal proceeding.

Fontaine was not the only person to discuss the position for which Smith had applied with members of the District Attorney's Office. Piazza, the jury warden, spoke on separate occasions with Assistant District Attorneys Lang and Holmes concerning the position. On one occasion, he asked Lang whether the position had been filled. Smith's name apparently was not mentioned. In two conversations with Holmes, he also inquired about the position. At the post-trial hearings before Justice Birns, Piazza testified that he did not mention Smith's name. Holmes testified, however, that Piazza mentioned Smith's name and asked him to see if Smith had applied for employment. Holmes replied that Smith was on the Phillips' jury and that the application would not be processed. He also advised Piazza not to have any contact with Smith. These three inquiries took place before a verdict was rendered.

Sometime thereafter, Holmes notified Assistant District Attorney Sudolnik, who was responsible for reviewing employment applications for the Major Felony Program, of Smith's application and the fact that he was a member of the Phillips' jury. The prosecuting attorneys, Jack Litman and Phillip LaPenta, were informed of the situation on or about November 14, 1974, and steps were taken thereafter to ensure that Smith would not be contacted by any member of the District Attorney's Office.

Upon being notified of Smith's application for employment, Litman and LaPenta conferred about whether defense counsel or the trial court should be informed. The trial, at that time, had not yet concluded. They reasoned that since Smith had indicated during the voir dire that he was interested in a career in law enforcement as an investigator and had a pending application with the federal Drug Enforcement Administration, this incident was not surprising or unexpected. Therefore, they assumed, so long as they did not contact the juror and did not gain any knowledge about his background which was unknown to the defense, they were not obligated to bring this matter to the attention of the Court or defense counsel.

On November 20, 1974, the jury retired to deliberate. At that time, three alternates

23, 1974 and was routinely referred to Assistant District Attorney Conboy. It was eventual-

ly submitted to Assistant District Attorney Sudolnik.

were available and could have been used as substitute jurors for Smith. (Trial Transcript at p. 6156). The next day, on November 21, 1974, the jury rendered its verdict convicting the petitioner. Neither the court nor defense counsel was yet aware that Smith had applied for employment with the District Attorney's Office or that various contacts had been made with members of that office by persons interested in promoting Smith's application.

At the time the jury rendered its verdict, Smith's employment application was still pending. He had not been invited to an interview nor had he been informed of the status of his application. Having been previously informed by Piazza through Fontaine that he should contact Assistant District Attorney Sudolnik about his application, Smith attempted to contact her by telephone the day after the jury's verdict was rendered. She was not available at the time he called, however, and did not return his call. He then called his former supervisor, Wallace Reilly, under whom he had worked in the past while employed as a guard at a department store. Reilly apparently knew several of the assistant district attorneys, and Smith asked him to inquire on his behalf. Reilly called Sudolnik and told her that Smith had worked for him and had done a good job. The fact that Smith had been a juror in the Phillips' case was also mentioned. She replied that Smith would be interviewed as would a number of other applicants and that the final selection was to be made by the New York City Bureau of Personnel and not the District Attorney's Office.

On December 9, 1974, District Attorney Richard Kuh informed the court that Smith had applied for employment during the pendency of the trial and that the two assistants had been approached regarding the application. Petitioner's defense counsel moved to vacate the verdict of the jury on the grounds of jury misconduct and prosecutorial misconduct. Justice Birns then held post-trial hearings at which the testimony of numerous persons, including Smith, was taken to establish a record of the events which occurred. Smith testified that while serving as a juror he did not consider whether the verdict would affect his application either favorably or unfavorably and that he did not think that it was improper to apply for employment when he did or that it was necessary to inform the court of his application.

Upon conclusion of the hearings, Justice Birns held that petitioner had not been deprived of his right to a trial before an impartial jury or otherwise prejudiced. Petitioner was then sentenced. On appeal, petitioner's conviction was affirmed without opinion. *People v. Phillips*, 52 App. Div.2d 758, 384 N.Y.S.2d 715 (1st Dep't). Thereafter, the New York State Court of Appeals denied leave to appeal. *People v. Phillips*, 39 N.Y.2d 949, 386 N.Y.S.2d 1039 (1976).

Having exhausted all available state remedies, petitioner commenced this action for a writ of habeas corpus on April 5, 1979. *Johnson v. Metz*, 609 F.2d 1052 (2d Cir. 1979).

*DISCUSSION*

■ The Sixth Amendment to the U. S. Constitution provides that a defendant in a criminal prosecution has a right to a trial by an impartial jury. This federal constitutional right is binding not only upon the federal courts, but also upon the individual states through the due process clause of the Fourteenth Amendment. *Duncan v. State of Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

The determinative issue here is petitioner's claim that he was denied his constitutional right to a trial before a panel of impartial jurors. The gravamen of his claim is the prejudice he contends he suffered as a result of a juror having applied for employment with the prosecuting attorney's office during the course of his trial, which application was still pending during the period of the jury's deliberations. The problems caused by this event were further exacerbated by the failure of the prosecuting attorneys to promptly notify the court and defense counsel of these circumstances before the conclusion of trial and before the jury began its deliberations. Indeed, this Sixth Amendment constitutional challenge

of the criminal conviction might have been avoided by prompt notification to the trial court and defense counsel and timely substitutional of one of the three available alternate jurors for Juror Smith before the jury commenced its deliberations.

## Test of Jury Bias

■ The issue of jury bias in a criminal trial involves mixed questions of law and fact, *Reynolds v. United States*, 98 U.S. 145, 156, 25 L.Ed. 244 (1878), for which there is no single determinative test. As stated in *United States v. Wood*, 299 U.S. 123, 146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936):

"Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."

■ In reviewing such claims, the federal courts have distinguished between those actions which involve claims of actual jury bias and those involving implied bias. Actual bias may be said to exist where there is sufficient evidence of a juror's prejudiced state of mind. *United States v. Haynes*, 398 F.2d 980, 984 (2d Cir. 1968), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124 (1969). Upon a showing by a defendant that a claim of actual bias is more than mere conjecture, the court will review the trial record for objective evidence of prejudice—or the lack thereof—such as explicit assertions of partiality or of impartiality by the suspected juror to determine the validity of such claim. *E. g., Mikus v. United States*, 433 F.2d 719 (2d Cir. 1970).

■ Where there is insufficient evidence of actual juror bias, the court may nevertheless find that a juror occupies a status or is a party to a relationship which, as a matter of law, raises the presumption of partiality. This presumption is conclusive and may not be defeated by affirmations of neutrality by the juror. *United States v. Haynes, supra*, 398 F.2d at 984.

The common law, see Blackstone's *Commentaries on the Law of England*, Bracton on the *Laws and Customs of England*, and *United States v. Burr*, 25 Fed.Cas.P. 49, 50 (14,692g) (C.C.Va.1807), provides the foundation for the formulation of the test for implied jury bias which is presently followed by the federal courts, the "average man" test. *Dennis v. United States*, 339 U.S. 162, 176, 70 S.Ct. 519, 527, 94 L.Ed. 734 (1950) (Black, J., dissenting); *United States v. Haynes*, 398 F.2d at 985. As set forth in *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1926):

"[E]very procedure which would offer a possible temptation to the *average man* . . . to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused, denies the latter due process of law." (Emphasis supplied).

■ Accordingly, in adjudging a claim of *implied* jury bias this Court must determine whether an average man in the position of the juror in controversy would be prejudiced. Whereas, in reviewing a claim of *actual* jury bias, the Court must determine whether the evidence produced supports the conclusion that the juror was in fact partial.

## Actual Bias

The record of the post-trial hearings in state court indicates that Juror Smith was not a passive, indifferent applicant for employment. Indeed, his active interest in the position he sought is manifest from his request that Fontaine obtain information for him about the position, from his immediate drafting of a resume and cover letter pursuant to Fontaine's instructions, from his efforts to contact Assistant District Attorney Sudolnik about the job after the trial was concluded, and from the efforts of his former supervisor, Wallace Reilly, to contact the District⸍ Attorney's Office at Smith's request. Moreover, since he had applied for the position of an investigator with the Major Felony Unit of the prosecutor's office while sitting as a juror in a criminal case involving a capital offense, it appears initially that petitioner's claim of actual jury bias is not mere unfounded speculation.

However, a further review of the record indicates that there is insufficient evidence to support a finding that Smith was actually partial to the State's case because of his desire to obtain employment. At the post-trial hearings before Justice Birns, Smith testified, in substance, that he was not influenced by his pending employment application and that he did not attempt to influence the other members of the jury. Although efforts were made by Piazza and Fontaine to contact members of the District Attorney's Office to urge that Smith be employed, Smith apparently was unaware of these solicitations and had not requested that such efforts be undertaken on his behalf. Further, the personal inquiries which he made himself and the efforts of Reilly which were made at his request did not occur until after the jury had rendered its verdict. Justice Birns who had observed the demeanor of all of the witnesses, including Smith who testified at the post-trial hearing concerning this issue, and who had the opportunity to observe Smith throughout the trial, concluded that Smith's judgment was not influenced by these circumstances.

Therefore, since petitioner has had ample opportunity to adduce evidence of actual prejudice, the Court finds that the record of this matter does not support petitioner's claim that Juror Smith was *actually* partial to the prosecution's case because he was seeking to obtain employment.

*Implied Bias*

In determining whether *implied* jury bias existed, the Court is mindful that it should not "create a set of unreasonably constricting presumptions that jurors [are impliedly biased because of] certain occupational or special relationships which might bear directly or indirectly on the circumstances of a given case . . . ." *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970). For example, it is clear that mere current governmental employment of a juror, unrelated to the circumstances of a criminal prosecution, is not sufficient to raise a conclusive presumption of jury bias. *United States v. Wood*, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78 (1936); *Frazier v. United States*, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948). Similarly, a former government employee is not barred from serving as a juror merely because of his prior employment. *Mikus v. United States, supra*, 433 F.2d at 724.

In determining that current or former government employees are not disqualified from serving as jurors as a matter of law, the Courts have reasoned that government employees have no different interest in a criminal matter than that of "any citizen who wishes to see crime properly punished." *United States v. Wood*, 299 U.S. at 149, 57 S.Ct. at 187. Nonetheless, it has been implied that exceptional circumstances may exist which would warrant a finding of inherent prejudice based on the employment affiliation of a juror. *Id.* at 150, 57 S.Ct. at 187; *Frazier v. United States*, 335 U.S. at 510, 69 S.Ct. at 208.

The reasoning of the Court in *Frazier* and *Wood* is consistent with the average man test set forth in *United States v. Burr, supra*, and *Tumey v. Ohio, supra*. *See Dennis v. United States*, 339 U.S. 162, 177, 70 S.Ct. 519, 527, 941 L.Ed. 734 (1950). Under this test, the average person employed by the government would not be held to be prejudiced against a defendant in a criminal prosecution, as a matter of law, because of that employment, absent exceptional circumstances.

But prospective employment of a juror by the prosecutor's office as an investigator is not the type of circumstance addressed in *Frazier* or *Wood* and is not, in the opinion of this Court, governed by their holdings. In those cases, the jurors were current government employees whose work was not related in any significant way to the matter being tried. Here, Smith was seeking employment in a clearly definable context which was closely related to the matter being tried; he sought employment as an investigator with the Major Felony Unit in the District Attorney's Office while sitting as a juror in a homicide case then being prosecuted by that very office. Under these circumstances, it is reasonable to conclude that the average person in Smith's position would believe that the verdict of

the jury would directly affect the evaluation of his job application. Moreover, it would not be unreasonable for such a juror to assume that the prosecutor's office had reviewed his application and, in the process of reviewing his background, had become aware that he was a juror in a significant criminal trial it was then prosecuting, although his employment application did not so state. The Court notes that here the District Attorney's Office was in fact aware that Smith, a juror, had applied for employment, although it learned of this for reasons other than through its investigation of job applicants. Under these circumstances, reason suggests that a person would indeed be likely to favor the prosecution's position—at least to some extent.

This Court does not find that a conclusive presumption of partiality in this instance is unreasonably constrictive. No significant class of prospective jurors is likely to be affected. Furthermore, extrajudicial communications between jurors and the office of the prosecuting attorney should not be countenanced. See *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). Nor has counsel for the respondent contended that a finding of implied juror bias would constitute an unreasonable limitation.

The established principle of implied jury bias is founded in English common law and has been adopted by American courts. As Blackstone noted, a prospective juror should not serve when it is shown:

> "that [he] is of kin to either party within the ninth degree; that he has been arbitrator on either side; that he has an interest in the cause; that there is an action pending between him and the party; that he has taken money for his verdict; that he has formerly been a juror in the same cause; that he is the party's master, servant, counsellor, steward or attorney, or of the same society or corporation with him." 3 Colley, *Blackstone Commentaries on the Laws of England* 363.

Similarly, Bracton states that if the defendant "suspects any of the twelve jurors he may remove him for just cause . . .

as where there are deadly enmities between some of them and the indicted man, or there is a greedy desire to get his land, as was said above; if there is ground for suspicion all are to be removed, that the inquiry may proceed free from all doubts." 2 Thorne, *Bracton on the Laws and Customs of England* 405 (1968). Our courts have frequently affirmed this tenet. Chief Justice Marshall stated in *United States v. Burr*, 25 Fed.Cas.P. 49, 50 (14,692g) (C.C.Va. 1807) that:

> "The relationship may be remote; the person may never have seen the party; he may declare that he feels no prejudice in the case, and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice."

Accordingly, the Court finds that Juror Smith was not qualified to sit as a juror because of implied bias and should have been removed from the panel of jurors. The assistant district attorneys who prosecuted these serious criminal charges in state court must share the responsibility for this inexcusable abridgement of the petitioner's Sixth Amendment right. They were aware of this problem long before the jury retired to deliberate and failed to bring this matter to the attention of the trial court or defense counsel. Since three alternate jurors were available at the time, this controversy could likely have been avoided by the substitution of another juror for Smith.

For these reasons, the petition for a writ of habeas corpus is hereby conditionally granted unless retrial of the petitioner commences within ninety days of the entry of this order.

SO ORDERED.