■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHARLES MEYER, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Westchester County, rendered February 21, 1979, convicting him of robbery in the third degree, upon a jury verdict, and imposing sentence. Judgment reversed, on the law, and new trial ordered. No issue has been presented with respect to the facts upon which the conviction is based. Following the close of the evidence and prior to the summations, one of the members of the jury approached the court and revealed that he was acquainted with two of the witnesses who had testified, one for the prosecution and one for the defense. The following colloquy occurred in chambers. Present were the Trial Judge, the juror, the prosecutor (Mr. Clerkin), and the defense counsel (Mr. Naclerio): "[THE JUROR]: I know Sergeant Faup. He is [sic] the detective back then. I know him through the business. He is a good friend of my boss. He has been in my office several times. I talked with him. He was in there just last week, as a matter of fact, on his insurance. The witness you called, Raymond Allen, I know him. Apparently before I worked with my employer now he used to do some filing for him. He comes in all the time. THE COURT: You mean the defendant's witness Raymond Allen, the young boy who testified? [THE JUROR]: Yes, who said he was with him the day before the alleged robbery. MR. CLERKIN: First of all, you indicated I think before we even started this trial during voir dire that you might have come across New Rochelle police officers. [THE JUROR]: Right. MR. CLERKIN: And I asked you the question specifically, and I think Mr. Naclerio did, also, would the fact that you may know police officers called to the witness stand influence you in your decision in this case. [THE JUROR]: Right. I don't think that will. That is not the problem. MR. CLERKIN: You promised both of us you wouldn't. [THE JUROR]: Yes. MR. CLERKIN: Now Andre Faub, who apparently is a police officer with New Rochelle whom you know, was

called as a witness, and you were told beforehand that the possibility exists someone you might know would be called to the stand. And this has happened. [THE JUROR]: O.K. MR. CLERKIN: I assume, and you tell me if I am wrong and tell his Honor if I am wrong, your promise to make this irrelevant to your decision still stands. [THE JUROR]: That part I can, the officer. MR. CLERKIN: As far as this other person is concerned, that was called by defense counsel, if you listened to the testimony, which I assume you did, you only can take what was brought forth by defense counsel at the time the questions were asked. [THE JUROR]: Right. MR. CLERKIN: I can have the record read back to you at a proper time if you think there is a question in your mind as to what took place on the witness stand. But you tell the Judge what your feelings are about the second person, because that apparently is the problem. THE COURT: Suppose we let Mr. Naclerio say what he wants to say. MR. NACLERIO: I would like to know what the problem is. From what you say, I gather also the problem is because you know Raymond Allen. You feel that might be a problem. [THE JUROR]: Yes. MR. NACLERIO: Would you tell us what that problem is? [THE JUROR]: I am not fond of the person and I don't—I really don't know how to say this. I don't think he is competent to really, you know, participate in any kind of proceeding. THE COURT: Are you telling us now, sir that as a result of listening to the testimony of Raymond Allen who testified in behalf of the defense you cannot be completely fair and impartial to this case? [THE JUROR]: I am not saying that. THE COURT: That is out of the way. You tell us what you are trying to tell us. [THE JUROR]: I just wanted to—O.K. The way I feel is this. He didn't say anything that really influenced me one way or the other. But I just wanted to make it known that I did know two of the people involved in this and I would feel better if I made it known. THE COURT: Of course. MR. CLERKIN: We appreciate that and we understand that. We appreciate your coming forth. I know his Honor does, I do, and I know Mr. Naclerio does. If you have a problem in terms of what was said—and I will repeat something, that it is your memory that controls. The testimony of the person you are alluding to, Raymond Allen, was very limited. THE COURT: Don't sum up now. MR. CLERKIN: I am not summing up. It was very limited. Take that into consideration. THE COURT: I will tell him what to take into consideration. Ask him questions. MR. CLERKIN: Specifically, are you telling his Honor, defense counsel and the people that you are still prepared to arrive at a fair and impartial verdict and wait until you hear what everybody else has to say before you arrive at your decision? [THE JUROR]: Yes. MR. NACLERIO: The fact that you stated you don't like Raymond Allen—[THE JUROR]: Yes, I did. MR. NACLERIO: Do you think that would affect your verdict in any way? I can think of a million ways it might. I don't want to go through each and every one. Can you think of a way that that could conceivably affect your ability to come up with a fair and impartial verdict? [THE JUROR]: No, not as it stands right now. In other words, if he were an eyewitness to the whole thing, I would definitely hold myself suspect." The court denied defense counsel's motion to have the juror excused and an alternate substituted. Two alternates were available at the time. CPL 270.35 provides, in part, that "If at any time after the trial jury has been sworn and before the rendition of its verdict * * * the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case * * * the court must discharge such juror." We find that the facts in this case indicate that the juror in question was "grossly unqualified" to serve and the court erred in failing to excuse him and substitute an alternate. In order to determine whether a sitting juror is "grossly unquali-

fied" to serve, it is helpful to look to CPL 270.20, particularly paragraphs (b) and (c) of subdivision 1, which provide, *inter alia,* that a prospective juror may be challenged for cause at the *voir dire* where he has "a state of mind that is likely to preclude him from rendering an impartial verdict" or where he "bears some other relationship to [a witness] * * * of such nature that it is likely to preclude him from rendering an impartial verdict." We note, however, that the statutory test to determine whether a sitting juror should be excused, that he is "grossly unqualified", places a greater burden upon the moving party. The juror in this matter had both a limited social acquaintance and a business relationship with the prosecution witness Sergeant Faup. This relationship indicates an "implied bias" which would likely have precluded the juror from rendering an impartial verdict (see *People v Branch,* 46 NY2d 645, 651; CPL 270.20, subd 1, par [c]; see, also, *Phillips v Smith,* 485 F Supp 1365; but see *People v Provenzano,* 50 NY2d 420). In situations of implied bias, no expurgatory oath may be given to overcome the possible bias *(People v Branch, supra).* With regard to the defense witness, Raymond Allen, the juror's comments indicated an actual bias both as to his personal feelings toward the witness and as to his faith in the witness' competence to participate in the proceeding. While an indication of actual bias may be overcome by an expurgatory oath that the juror believes that his state of mind will not influence his verdict and that he can render an impartial verdict according to the evidence (CPL 270.20, subd 1, par [b]; *People v Biondo,* 41 NY2d 483, cert den 434 US 928), such an oath must be unequivocal *(People v McQuade,* 110 NY 284). The juror's responses here did not unequivocally indicate that he was willing and able to set aside his bias toward Mr. Allen. Therefore, we hold that the combined effect of the juror's relationships with these two witnesses rendered him "grossly unqualified" to continue serving on the jury. We do not reach the question of whether either of these relationships standing alone would reach the level of a gross lack of qualification required by the statute. We again express our view that in order to avoid the possibility of unfairness Trial Judges should disqualify prospective jurors of questionable impartiality rather than permitting them to serve *(People v Moorer,* 77 AD2d 575; *People v Sellers,* 73 AD2d 697; see, also, *People v Branch, supra).* This principle is equally applicable in cases such as the instant one, involving sitting jurors, especially where alternates are available. In view of our decision to reverse on this ground, we need not address defendant's other arguments. Mollen, P. J., Hopkins, Titone and Weinstein, JJ., concur.