**UNITED STATES of America,**

v.

**William KELLEY et al., Defendants.**

**No. 71 Cr. 1108.**

United States District Court,
S. D. New York.

Nov. 17, 1971.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, for the United States; Dean C. Rohrer, Asst. U. S. Atty., of counsel.

Emanuel Molofsky, New York City, for defendant Kelley.

Frederick H. Block, New York City, for defendant Pinkney.

Howard L. Jacobs, New York City, for defendant Hairston.

FINDINGS OF FACT AND OPINION

EDWARD WEINFELD, District Judge.

In this nonjury case, three defendants, William Kelley, Robert Pinkney and Robert Hairston, are charged with having stolen in excess of $100 from the Marine Midland Bank of Southeastern New York, an FDIC insured bank, in violation of 18 U.S.C., section 2113(b), and of the aiding and abetting law, 18 U.S.C., section 2.

To sustain its burden of proof, the government relied upon the testimony of

two bank tellers, Miss Ellen Goff and Mrs. Ellen Luse, who testified as to events during the course of which the funds were stolen, and who identified one or more of the defendants; also, upon pictures developed from a film contained in surveillance cameras which were activated during the theft; and finally upon admissions by each defendant.

The evidence established that the defendants acted in concert in carrying out a well calculated plan. The following facts and inferences may be distilled from the cumulative testimony of the two bank tellers and the pictures developed from the surveillance films. The three defendants entered the bank on March 23, 1971, at about 2:50 p. m., shortly before the closing hour. Initially, they sought to divert attention and to allay suspicion as to the actual reason for their presence at the bank by laughing, joking and "fooling around." One of them, Kelley, then induced teller Luse to leave her station by asking for coin wrappers, which were stored some distance from the station. During her absence, and while Hairston diverted the attention of the two tellers at adjacent stations, Pinkney leaned over the counter at Mrs. Luse's station, opened the cash drawer, which she had left unlocked, and removed funds therefrom, including "bait" money, the removal of which activated the surveillance cameras. While Pinkney was so engaged, Kelley kept watch at his side. Hairston then walked toward the exit and delayed Mrs. Luse's return to her station by asking for, and receiving, the coin wrappers at another teller's station, the one closest to the exit. Kelley and Pinkney, who had in the meantime completed their missions in the operation and left Mrs. Luse's station, paused in wait for

Hairston. The three then left the bank together. Testimony as to the speed at which the cameras took pictures and the number of frames from the point at which the cameras were activated by the removal of the "bait" money to the defendants' exit from the bank indicates that forty seconds elapsed in that interval. Within minutes of that exit uniformed policemen entered the bank, the removal of the "bait" money having triggered an alarm as well as the cameras. Mrs. Luse, apparently realizing that the alarm had sounded, and suspecting that her own cash drawer had been the object of a theft, opened it and discovered the "bait" money was gone. She immediately notified the bank manager, who easily opened the cash drawer from the customer's side by leaning over and pulling it out partially by its recessed handle, completing the process by pushing on the sides of the drawer. This took about three seconds.

 Mrs. Luse, as well as Miss Goff, positively identified the defendant Kelley, but she was not as certain as to Pinkney and Hairston; she testified they "appeared to be" the two men with Kelley. The defendants Pinkney and Hairston attack this identification as insufficient. There is no rule of law, however, that requires an identification to be positive beyond any shadow of doubt. "[T]he law does not insist on the impossibility of error as a condition to testimonial competence."[1] The sufficiency of identification is generally for the trier of fact. Testimony by a witness that although he is not absolutely sure, a defendant "resembles" or "looks like" the person the witness observed and in regard to whom he has testified, may be sufficient when considered with other evidence.[2] Here there was much more than the testimony of eye-

---

1. United States v. Wilkes, 451 F.2d 938, —— (2d Cir. 1971).

2. *See* United States v. Scarpellino, 431 F.2d 475, 477 (8th Cir. 1970); United States v. Johnson, 427 F.2d 957, 961 (5th Cir. 1970); Smith v. United States, 358 F.2d 695 (5th Cir.), cert. denied,

384 U.S. 971, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); Roberts v. United States, 109 U.S.App.D.C. 75, 284 F.2d 209 (1960), cert. denied, 368 U.S. 863, 82 S.Ct. 109, 7 L.Ed.2d 60 (1961); United States v. Carminati, 247 F.2d 640, 646 (2d Cir.), cert. denied, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113 (1950).

witnesses who identified the defendants. The pictures developed from the surveillance films unmistakably and clearly show each defendant in various positions in the bank immediately before the money was discovered missing. The sequence of events depicted corroborates the testimony of the witnesses. A more perfect portrayal of how the theft was accomplished can hardly be imagined— unless a sound track were furnished as well. A proper foundation for the admission into evidence of these pictures was laid by the testimony of tellers Luse and Goff as to the placement of the cameras, the means by which they were activated and that the pictures were fair and accurate representations of the men they described and the occurrences at the bank on the afternoon of the theft.[3] Each teller marked photographs to indicate separately each defendant she identified.

In addition to the direct and circumstantial evidence, each defendant, upon his arrest by agents of the Federal Bureau of Investigation, made significant admissions, that of each considered, of course, only as against him. The Court, upon prior inquiry, found beyond a reasonable doubt that the admissions were freely, voluntarily and understandingly made after each was advised of his constitutional rights in accordance with the *Miranda* formulation. Each defendant acknowledged his identity in cropped prints developed from the surveillance films. Pinkney, who found the photograph shown to him "embarrassing," acknowledged that he went to the teller's window at the bank, asked for coin wrappers, distracted the teller, and had bought heroin with money taken from the bank. Hairston, in a signed statement, admitted he participated in the theft; that his role "in the larceny was to distract the teller in the bank leaving the money unguarded," and that his "share of the loot was approximately

$200." Although some details of the respective admissions of Pinkney and Hairston vary somewhat from other evidence as to the precise roles they played, their statements cumulatively confirm government witnesses' testimony of the defendants' participation in the theft, and that all were acting in furtherance of their common venture.

The defendants seek to challenge the integrity of Mrs. Luse's testimony as to the amount of money taken in the theft. Mrs. Luse testified that the "bait" money was in her drawer immediately before Kelley approached her station, and that upon a count of the cash in her drawer within minutes after the three men left the bank, $1000 was missing, composed of $500 in twenty dollar bills in the "bait" money package and an additional $500. Her testimony as to the prove-out procedures regularly followed by her and the count made right after the events here described is so persuasive that there is no basis for the speculative theories that the shortage might have been due to causes other than the theft. The absence of "bait" money after the theft and its presence immediately prior thereto was fully established by Mrs. Luse's testimony; and, of course, as to the defendant Hairston, there is his admission that his share of the loot came to approximately $200.

In addition to the other essential elements of the crime charged, the government also proved beyond a reasonable doubt that the amount of the theft was in excess of $100.

The defendants, exercising their constitutional right, called upon the government to establish the essential elements of the crime charged. This it did, not only beyond a reasonable doubt, but to this trier of the fact, beyond any possible doubt.

The foregoing shall constitute the Court's Findings of Fact.

3. *See* Mikus v. United States, 433 F.2d 719 (2d Cir. 1970); United States v. Hobbs, 403 F.2d 977, 978 (6th Cir. 1964).