**Midland Steel Products Co. v. International Union**
**Case No. 57963**
**Cuyahoga County, (8th)**
**Decided February 1, 1990**
[Cite as 1 AOA 295]

*For Plaintiff-Appellee:*
*Lee J. Hutton, Esq., Frank Buck, Esq., Nick Linn, Esq., Duvin, Kahn & Bernard, 20th Floor-Erieview Tower, 1301 East Ninth Street, Cleveland, Ohio 44114.*

*For Defendants-Appellants:*
*William P. Bobulsky, Esq., Betty Gardina, Esq., Bobulsky & Gardina, 1612 East Prospect Road, Ashtabula, Ohio 44004.*

J.F. CORRIGAN, J.

Defendants, the United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 486 ("the Union"), and various union members, appeal from the judgment of the trial court which deemed eight union members in contempt of court for violating provisions of a temporary restraining order entered following a strike at Midland Steel Products Co.

I

The record reveals that on March 1, 1989, the collective bargaining agreement in effect between the union and Midland Steel Products Co. ("Midland") expired, and on June 2, 1989, the union commenced a strike. Also on June 2, 1989, the company obtained a temporary restraining order ("TRO") which barred the union from: (a) threatening, coercing, and harassing persons having dealings with Midland; (b) blocking and obstructing ingress and egress into the plant, (c) intimidating and perpetrating violence upon persons having dealings with the company; (d) trespassing or parking vehicles upon company property; (e) following and/or intercepting the vehicle of any person having dealings with the company; (f) obstructing the company's facilities; (g) interfering with or damaging company property or the property of the persons having dealings with company; (h) congregating at or near the plant in a manner that does not constitute peaceful picketing, and from stationing more than two pickets near the plant entrances at any one time; and (i) aiding or abetting in the commission of any of the aforementioned acts.

The records of service filed by the county sheriff indicated that copies of the TRO were posted at the plant entrances on June 2, 1989, and that additional copies were personally served upon pickets at the strike location. In addition, counsel for the company hand delivered a copy of the TRO to counsel for the union in the presence of three union officials, including Donald McGhee. (Tr. 46-47.) Finally, it was established that copies of the order were delivered to the union hall, and that the Cleveland Plain Dealer mentioned issuance of the TRO in its June 3, 1989 edition. (Tr. 47, 307.)

On June 8, 1989, the TRO was amended to limit the scope of subsection (h) by prohibiting congregation within 1,000 feet of the plant and its parking facilities.

On or about this same date, the company filed a motion to show cause, alleging that the following persons had violated the TRO: Tommy Gregg; Victor Minko; Ron Orbas; Steve Vano; Dennis Monahan; Doyle Titlow; Larry Langford; and Jeffrey Markiewicz. On June 12, 1989, the company filed a second motion to show cause, alleging that chief shop steward Leon Tate had also violated the TRO. The court subsequently set both matters for hearing on June 15, 1989, after denying defendants' motion for a continuance.

With respect to the events of June 3, 1989, the first day of the strike, Terry Anderson, a plant worker hired after the strike, indicated that on this day, he attempted to enter the plant on a bicycle, and was thrown to the ground by defendant Gregg. (Tr. 201-205.)

Testimony concerning subsequent events was provided by Robert Helton, Midland's Vice President of Industrial Relations and Personnel. Helton stated that there had been numerous violations of the TRO, many of which had been recorded by a plant surveillance system. Helton explained that this system consists of three video cameras mounted at various locations at the plant, and a fourth camera, through which events are recorded. (Tr. 26-27, 34-37.) Helton further stated that he monitored the system following issuance of the TRO, and observed a number of violations of the TRO which had been recorded on six videotapes. Helton testified that he compiled a summary tape of the various incidents from the six original tapes. (Tr. 39-41.) According to Helton, the six original tapes and the summary tape accurately

depict the events shown. (Tr. 34-39.)

As the summary tape was played for the court, Helton narrated the events depicted. With respect to the events of June 3, 1989, Helton explained that camera No. one, posted at the corner of West 106th Street and Madison Avenue, had recorded seventeen people including union officials Donald McGhee and defendants Tate and Gregg congregating in the area of the main gate. (Tr. 46.)

With respect to the events of June 4, 1989, Helton observed the summary tape and testified that it depicted defendant Minko throwing rocks at a surveillance camera. (Tr. 51.) Helton further testified that McGhee was present, and a copy of the TRO was posted nearby. (Tr. 53-54.)

As to the events of June 6, 1989, Helton stated that the tape obtained from camera one depicted defendant Monahan throwing a rock at an exiting worker. (Tr. 55-58.)

The videotape from June 7, 1989 depicted various people congregating in the union hall parking lot, located near the main gate of the plant, including union official McGhee. (Tr. 76.) Defendant Orbas' pickup truck is also depicted, and a bag of eggs are in the bed. (Tr. 60.) The tape next indicates defendants Vano, Orbas, Titlow, Markiewicz, and Langford throwing eggs. (Tr. 90-92.)

Helton explained that while monitoring the system, he was in communication with plant guards stationed outside the plant via a two-way radio. (Tr. 79.) As the guards reported incidents to him, Helton located the events using the camera, and recorded the events being described. (Tr. 80.) Thus, Helton explained that he learned from a guard that defendant Monahan had threatened the plant's Safety Director, Stuart Warner, and Helton then observed the surveillance system and saw Monahan throw a rock in the direction where Warner was standing. (Tr. 80-81.)

Next, Helton testified that the tape from June 7, 1989 depicted one of the company's attorneys talking to McGhee (Tr. 90) and further depicted two pickets stationed at the main gate, in compliance with subsection (h) of the TRO. (Tr. 87.)

Helton's testimony was corroborated by Stuart Warner who actually observed demonstrations outside the main gate on June 7, 1989. According to Warner, union members who had congregated in the union hall parking lot shouted, gestured, and threw things at the entering workers. (Tr. 330.) Warner further testified that defendant Vano threw two eggs, one of which hit a vehicle, and defendant Orbas threw an egg, also hitting a vehicle. (Tr. 339-342.) Warner also observed defendant Monahan hit a vehicle with a rock, and observed that Monahan threw a second rock at him. (Tr. 336.) Finally, Warner testified that union officials Weems, McGhee, Hallo and Tate were present during these events but did nothing to stop them. (Tr. 346-347.)

Curtis Barr, an independent truck driver who transports finished products from the plant, next testified that on June 8, 1989, he was followed by a gray car as he left the plant. (Tr. 153-157.) According to Barr, he proceeded to the area of West 25th Street in an attempt to evade the car. (Tr. 160-161.) His path was subsequently blocked, and the car then stopped next to Barr's truck, boxing it in. (Tr. 161.) Barr got out of the truck, and the driver and passenger of the car likewise exited, with their fists raised. (Tr. 163.) He next observed a knife in the driver's hand, and proceeded to the rear of his trailer. (Tr. 163-164.) As Barr removed a strap which had been securing the load, the driver confronted Barr, cut the strap, and threatened to harm Barr if he should return to the plant. (Tr. 164.) Finally, Barr identified defendant Tate as his assailant. (Tr. 166.)

At the close of the company's case, defendants moved for a directed verdict contending, *inter alia*, that there was no indication that defendants had actual notice of the TRO, that the vidoetapes were insufficient to establish violations of the TRO, and that the trial court prejudiced defendants' ability to prepare for trial by refusing to continue the contempt hearing. The trial court denied the motion, and defendants proceeded with their case.

Defendant Gregg testified that he was present at the main gate on June 2, 1989 not for picket duty but so that he could "look a scab in the face and let him know I don't appreciate him taking my job." (Tr. 644.) He denied assaulting Terry Anderson, however, and he posited either that Anderson had erroneously identified him or that Anderson fabricated the incident. (Tr. 648-650.)

Defendant Ron Orbas testified that he was with other union members near the main gate of the plant on June 7, 1989. He stated that they went there to confront the workers hired during the strike. (Tr. 604.) He further admitted that eggs were in the bed of his pickup truck, and that he threw eggs, as portrayed in

the company's videotapes. (Tr. 609.) He stated that he threw the eggs only to slow down workers entering the plant, however. (Tr. 610, 620.)

Orbas next denied having notice of the TRO, and stated that although papers were posted at the union hall, he did not take notice of them. (Tr. 618.) He stated that the union had assigned only two pickets to crash the gate, however (Tr. 611), in compliance with the TRO.

Defendant Steven Vano testified that he coordinated picket duty during the strike (Tr. 623), and he admitted to throwing an egg on June 7, 1989 as he is portrayed on the videotape. (Tr. 629.) He stated that he did so out of frustration, however. (Tr. 629.)

Defendant Monahan likewise admitted to throwing rocks at workers attempting to enter the plant during the June 6, 1989 evening shift change, as he was portrayed on the videotapes. (Tr. 666-667.) In mitigation, however, he stated that he was intoxicated. (Tr. 667.) Monahan also admitted to throwing a rock at workers attempting to enter the plant the next morning as portrayed on the videotapes, but he explained that he was still "a bit inebriated" at this time. (Tr. 670-671.)

Defendant Leon Tate admitted to a confrontation with Curtis Barr on June 8, 1989, but claimed that Barr was the aggressor. According to Tate, he and another union member followed Barr as he left the plant so that they could determine Barr's final destination. (Tr. 521.) Tate denied boxing Barr in, however, claiming that Barr voluntarily stopped, (Tr. 523) and they then asked him where he was going. (Tr. 524.) Tate further claimed that Barr then got out of his truck in a fit of rage, approached Tate's vehicle on the passenger side, and began to scream at the two union members. (Tr. 525.) At this point, Tate got out of his vehicle, and Barr retreated to the rear of his trailer, then released a strap which had been securing his load. (Tr. 526.) Tate stated that he likewise attempted to release a strap from the trailer, but was unsuccessful. (Tr. 526.) Tate then produced a knife, and cut Barr's strap to prevent Barr from using the strap as a weapon. (Tr. 527.)

Tate further stated that he became aware of the TRO on or about June 4, 1989, but he stated that to his knowledge it only prohibited the stationing of more than two pickets of each gate. (Tr. 511-512.)

Following the close of defendants' evidence, the trial court found all eight defendants in contempt of court, and sentenced them to thirty days' imprisonment,[1] and two years' probation, and fined them $500.00.

## II

In their first assignment of error, defendants contend that the trial court erred in finding the eight union members in contempt of court. Defendants advance six arguments in support of this contention which we will consider in turn.

### A. *Knowledge of the Terms of the TRO*

Defendants first argue that the convictions must be reversed because they did not have knowledge of certain provisions of the TRO at the time they committed the acts found to be contemptuous. This claims lacks merit.

Civ. R. 65(D) provides in pertinent part as follows:

> "Every order granting an injunction and every restraining order *** is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice *of the order* whether by personal service or otherwise." (Emphasis added.)

See, also, *State, ex rel. Bruns Coal Co.* v. *Compton* (1953), 96 Ohio App. 541, 549-550.

In this case, the following defendants admitted that they had actual knowledge of the TRO: Tate (Tr. 535); Orbas (Tr. 618); Vano (Tr. 633); Gregg (Tr. 653); Monahan (Tr. 672). Thus, the TRO was fully binding upon them by operation of Civ. R. 65(D).

Further as the record demonstrates that defendants Titlow, Langford and Markiewicz honored the provision in the TRO which restricted the number of pickets allowed at each plant entrance, the trial court could reasonably conclude that these defendants had notice that the TRO had been issued.

Finally, while defendants posit that the company was required to prove that all of the union members had actual knowledge of the specific provisions of the TRO, we hold that this duty fell upon the union officials upon whom the TRO was personally served. See *State, ex rel. Bruns Coal Co.* v. *Compton, supra*, at 20-21, where the court stated:

> "On the question of knowledge, and on

the question of the duty which this permanent injunction imposed upon the defendants, officials and organizers of district No. 6 and of The United Mine Workers of America, it is the claim of the defendants that this injunction was entirely passive and contained no mandatory features and, consequently, that they were under no duty to inform their members of the same or the terms thereof. With this contention we do not agree. We hold that this injunction order, by its terms imposed a duty of these defendant officials to see that their members knew of the order and the terms thereof. We believe that they did, because at first pickets were posted as allowed by the injunction and it was otherwise complied with. One would have to be naive to hold that the circumstances as shown to have existed in this case failed to show actual knowledge. If any other argument is needed, section No. 6 of the injunction is directed to aiding or abetting any person in committing any of the interdicted acts. We cannot perceive that either the officials or actual demonstrators were not aiders and abettors.

"The United Mine Workers of America is one of the most powerful and potent unions in this country. It is tightly organized from top to bottom. We know from recent history that a directive or even a suggestion from national or district headquarters is obeyed as a matter of policy. The union has demanded and has been accorded the right to organize and the right to bargain on an industry-wide basis. Certainly these rights and privileges carry with them a corresponding duty and obligation to maintain lawful and contractual discipline among its members as far as industrial disputes are concerned. Were it otherwise it would be impossible to maintain orderly government because of the ease with which other members from other localities and stated could violate any order of any court by the simple expedient of claiming lack of knowledge."

B. *Standard of Proof/Intentional Violations*
Defendants argue that the convictions must be reversed because there is no evidence that they intentionally violated the TRO. As this matter concerns the imposition of punishment for conduct occurring outside the presence of the

court, it involves criminal, indirect contempt. *In re Carroll* (1985), 78 Ohio App. 3d 6, 8-9. Accordingly, defendants' intent to violate the order must be proven beyond a reasonable doubt. *Id.* at 10; accord *Pease Co.* v. *Local Union 1787* (1978), 59 Ohio App. 2d 238, 240.

As we noted previously, however, the record establishes that defendants had notice of the TRO yet acted in open defiance of it by engaging in various forms of harassment of persons continuing to do business with the company. From this, it can be inferred beyond a reasonable doubt that defendants intentionally violated the TRO.

Defendants next argue that the convictions must be reversed because the trial court did not require proof beyond a reasonable doubt. This claim is simply unsupported by the record as the reasonable doubt standard was consistently argued by the parties (Tr. 449, 793) and defendants have failed to demonstrate that it was not applied by the court. Cf. *Bd. of Edn.* v. *Hamilton Classroom Teachers Assn.* (1982), 5 Ohio App. 3d 51, 54.

C. *Denial of Defendants' Motion for a Continuance*
Defendants next argue that the trial court erred in denying their motion to continue the hearing on the motion to show cause as this prevented defendants from conducting discovery and impaired preparation of their defense.

The determination of what constitutes a reasonable period of time between the issuance of a show cause order and the commencement of proceedings in contempt is within the sole discretion of the trial court. *Pease Co.* v. *Local Union 1787, supra.* In that case, the court of appeals concluded that the trial court did not abuse its discretion in holding the contempt proceedings five days after issuance of the order to show cause. The court stated:

"Using this *ad hoc* approach as our standard here, we are unable to conclude that defendants, most of whom had five days to discuss the charges with union counsel and to prepare their defense, were prejudiced by the trial court's denial of their motion for a continuance. The charges against them were neither complex nor lengthy, and all involved the same type of alleged contemptuous acts. Considering these circumstances, the trial court exercised sound discretion in avoiding protracted legal maneuvering which would

have permitted a continuation of the possibly incendiary situation at the plants and store outlets of the Pease Company. The time allowed for the defense to prepare its case was adequate under the flexible due process standards enunciated in the aforementioned federal cases and meets the requirements of R.C. 2705.03. Accordingly, we overrule the first assignment."

As we find this rationale entirely applicable to this case, we cannot conclude that the trial court erred in holding the hearing on the charges of contempt seven days after the order to show cause was entered.

D. *The Trial Court Committed Prejudicial Error in Convicting Defendants of Violating Provisions of the TRO which Plaintiff did not Accuse them of Violating.*

This contention lacks merit. First, while the record does reveal that the trial court determined that the defendant had violated subsections (f) and (h) of the TRO, and the company did not specifically argue that defendants had violated these subsections, defendants have failed to demonstrate any prejudice resulting from this determination. For the journal entries filed in the cause indicate merely that defendants were in violation of the TRO generally, and the record establishes that plaintiff both alleged and proved at least one violation of the TRO committed by each defendant. Thus any error in the trial court's determination that defendants had additionally violated subsections (f) and (h) must be considered harmless beyond a reasonable doubt. Crim. R. 52(A).

E. *Defendants Were Erroneously Convicted of Violating Subsection (h) of the TRO which Prohibits Picketing "At of Near" the Plant As This Provision is Unconstitutionally Vague.*

F. *Defendants Were Erroneously Convicted of Violating Subsection (h) of the Amended TRO as the Amended TRO was not in Effect when the Acts of Contempt Occurred.*

Initially, we hold that the latter contention is without merit as the journal entries filed in this matter indicate that defendants were found to have violated subsection (h) of the original TRO, and not the amended TRO. Further, while the prohibition against picketing "at or near" the plant may not have fully apprised the strikers of the precise locations of lawful assembly, cf. *State* v. *Garlenbaugh* (1985), 18 Ohio St. 3d 19, 21, we cannot conclude that any defendant was prejudice thereby, as not one of the defendants we found in contempt of court merely for congregating near the plant. Instead, the record establishes that each defendant had engaged in some form of harassment of persons continuing to do business with the plaintiff.

For the foregoing reasons, defendants' first assignment of error is overruled.

III

For their second assignment of error, defendants contend that the sentences imposed are outside the statutory framework established in R.C. 2705.05, and are disproportionate and excessive.

While R.C. 2705.05(A) does purport to limit the penalties which may be imposed for contempt of court to a fine of $250 and imprisonment of not more than thirty days for a first offense, it has been held that the power to punish for contempt is an inherent power of a court, which is not subject to legislative control. *Cincinnati* v. *Cincinnati District Council 51* (1973), 35 Ohio St. 2d 197 (upholding fines totalling $37,000 imposed upon defendants found to have violated a permanent injuction); *Call* v. *G.M. Sader Excavating Paving, Inc.* (1980), 68 Ohio App. 2d 41; *Olmsted Township* v. *Riolo* (June 9, 1988), Cuyahoga App. No. 54004, unreported (upholding fines totalling $26,500 for violating an injunction which prohibited the defendant from maintaining a junk yard on his property). Accord *State* v. *Kilbane* (1980), 61 Ohio St. 2d 201 (dicta reaffirming court's holding in *Cincinnati* v. *Cincinnati District Council 51, supra*); *State* v. *Local Union 5760* (1961), 172 Ohio St. 75 (holding that the inherent power of a court to punish for contempt generally may not be limited by legislative authority). Accordingly, we reject defendant's claim that their sentences must be vacated for exceeding R.C. 2705.05.

In their proportionality argument, defendants contend that the trial court abused its discretion in sentencing Vano, Orbas, Markiewicz, Titlow, and Langford because, they claim, each was convicted of violating the TRO based upon evidence that they threw eggs at workers entering the plant, yet the court partially suspended the sentences of only Vano and Markiewicz, thereby imposing disproportionate sentences for the same offenses.

We disagree as it is clear from the record that the conduct of Vano and Markiewicz was unlike the conduct of the other defendants. That is, unlike Markiewicz, Titlow and Orbas actually struck vehicles with eggs, thereby subjecting them to almost immediate damage. (Tr. 433, 222, 223.) Further, whereas Vano offered in mitigation that his conduct was the result of frustration from the circumstances surrounding the strike, Langford offered no explanation for his conduct. Accordingly, we find the sentences sufficiently tailored in this instance and we reject the disproportionality claim. Accord *Bd. of Edn.* v. *Hamilton Classroom Teachers Assn.*, *supra*, at 55.

Defendants' second assignment of error is overruled.

## IV

For their third assignment of error, defendants suggest that the trial court erred in admitting the videotapes into evidence because, they claim, the videotapes were not authenticated, and were highly prejudicial. Both claims lack merit.

### A. *Authentication*

Pursuant to Evid. R. 901, the requirement of authentication will be satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims."

While defendants argue that the videotapes at issue here could not be authenticated because they were created by the remotely placed surveillance system (Tr. 143-144), this fact will not bar authentication. That is, remotely created videotapes will be properly authenticated upon a showing that: (1) the area upon which the camera was focused is the subject of the videotape; (2) the camera was activated to record the events depicted; and (3) the videotape is a fair and accurate representation of the actual occurrences it depicts. See *Mikus* v. *United States* (C.A.2, 1970), 433 F.2d 719, 725; *United States* v. *Kelley* (S.D.N.Y. 1971), 334 F.Supp. 435, 437, affirmed without opinion (C.A.2, 1973), 471 F.2d 647; *State* v. *Deering* (Iowa 1980), 291 N.W.2d 38, 40. See, generally, Annotation (1985), 41 A.L.R. 4th 812.[2]

This tripartite showing was met in the instant case. First, Helton established the areas monitored by each of the three surveillance cameras. (Tr. 26.) Secondly, Helton testified that he directed and controlled operation of the cameras, thereby creating the tapes. (Tr. 28.)

Finally, Helton established that he monitored the events being recorded, and that the resulting tapes were a fair and accurate representation of the events depicted. (Tr. 34-37.) This claim was in turn corroborated by Stuart Warner who actually observed the events taking place. (Tr. 326-343).

Thus we cannot conclude that the videotapes lacked proper authentication.

### B. *Prejudice*

Our duty with respect to defendants' claim that the videotapes were too prejudicial is to ascertain whether the trial court abused its discretion in admitting them. *State* v. *Mann* (1985), 19 Ohio St. 3d 34, 38. We find no abuse of discretion in this case as the record establishes that the tapes were simply neutral representations of the events of the strike which undoubtedly assisted the court in determining what actually occurred.

Defendants' third assignment of error is overruled.

## V.

In their final assignment of error, defendants claim that the trial court erred in denying defendants' motion for a directed verdict on behalf of Titlow, Markiewicz, and Langford, because the plaintiff's claims with respect to these defendants were established only through uncorroborated videotapes. That is, defendants claim that authentication cannot be established without a sponsoring witness who actually observed the events depicted on the videotapes. We reject this claim.

Videotape evidence of conduct has been deemed admissible in the absence of a sponsoring witness, pursuant to the "silent witness theory" in the vast majority of jurisdictions considering the issue. See *Fisher* v. *States* (Ark. App. 1982), 643 S.W.2d 571, 575-576, and citations listed therein. In this situation, authenticity will be established where the trial court can determine that the trier of fact can reasonably infer from viewing the subject tape that the subject matter depicted is what the proponent claims. *Id.*

In accordance with the foregoing, we hold that the court could reasonably infer that Titlow's, Markiewicz's, and Langford's behavior was in fact the same as depicted on the tapes even though no live witness actually observed this behavior. Accordingly, the videotape constitutes a "silent witness" of that behavior, and the trial court correctly denied defendants'

motion for acquittal of these defendants.

The fourth assignment of error is overruled.

In accordance with the foregoing, the judgment of the trial court finding defendants in contempt of court is affirmed, and defendants' sentences are affirmed.

It is ordered that appellee recover of appellants its costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the *Common Pleas* Court to carry this judgment into execution.

KRUPANSKY, P.J., and ANN McMANAMON, J., Concur

---

[1] Part of this time was ordered suspended for some of the defendants.

[2] Ohio has not yet considered this issue.