(December 29, 2011)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER M. WLASIUK, Appellant. [935 NYS2d 709]—

Mercure, A.P.J.

Defendant was convicted in 2003 of the crime of murder in the second degree in connection with the death of his wife (hereinafter the victim), whose body was found next to defendant's submerged pick-up truck at the bottom of Guilford Lake. Defendant was present at the scene and, when the ensuing investigation both contradicted his version of the events and revealed evidence suggesting that he had killed the victim at their home and then staged a motor vehicle accident, police became suspicious. Upon defendant's appeal from his judgment of conviction, this Court concluded that "the cumulative effect of a litany of errors deprived defendant of a fair trial" and, therefore, we reversed (*People v Wlasiuk*, 32 AD3d 674, 675 [2006], *lv dismissed* 7 NY3d 781 [2006]). Following remittal, County Court granted defendant's motion for dismissal of the original indictment.

Thereafter, the People were given permission to resubmit the charge to a grand jury. Defendant was again indicted in 2007 and convicted of murder in the second degree at the close of a second jury trial. County Court denied his subsequent CPL 330.30 motion to set aside the verdict, and sentenced defendant to 25 years to life in prison. Defendant appeals and, because we conclude that he was denied the effective assistance of counsel at trial, we now reverse.

Initially, we reject defendant's argument that the verdict was

against the weight of the evidence.[1] To support the verdict of intentional murder in the second degree, the People were required to prove that "[w]ith intent to cause the death of [the victim], [defendant] cause[d] [her] death" (Penal Law § 125.25 [1]). At trial, the People presented evidence that, on the night of the accident, defendant provided several differing accounts of the events leading to the victim's death. At times, defendant indicated that he was driving his pick-up truck and had swerved to miss a deer, driven into the lake, and that the victim was still in the truck; at other points, he stated that the victim was driving and had swerved to miss a deer, and that he was able to pull the victim out of the truck but not out of the water. In the days and months following the accident, defendant continued to give different accounts to investigators, stating that the victim had swerved, fishtailed and then driven into the lake at 50-60 miles per hour, that he and the victim had been sucked under the truck, and that the victim was not drinking before the accident; subsequently, he claimed that the victim had been drinking prior to the accident and had driven into the lake after making a k-turn while arguing with him, rather than swerving to avoid a deer.

None of these descriptions of the incident was consistent with the testimony of an accident investigator and reconstructionist. They opined that the truck—which was not significantly damaged—was traveling no more than 30 miles per hour when it entered the lake through the only direct opening to the water from the road in the vicinity, and observed that there were no skid or yaw marks suggesting that the vehicle swerved to avoid a deer, or indications that the vehicle made a k-turn before entering the lake. In addition, the doors of the truck were closed and locked, casting doubt on defendant's statement that he had escaped through the passenger door. Witnesses nearby did not hear any sounds of a car accident or defendant screaming the victim's name, as he claimed to have done, and defendant told a resident who attempted to rescue the victim after 911 was called not to go into the cold water because it was dangerous. Furthermore, first responders at the scene indicated that defendant's hair was neat and dry, he was not hypothermic, did not seem to be cold, and appeared to be faking his shivering, despite his claims that he had been in the approximately 40-degree

---

1. Defendant also challenges the legal sufficiency of the evidence. Although he failed to preserve this challenge, we nevertheless must consider the sufficiency of the proof in determining whether all elements of the charged crime were proven beyond a reasonable doubt (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]; *People v Nesbitt*, 69 AD3d 1109, 1110-1111 [2010], *lv denied* 14 NY3d 843 [2010]).

lake water for several minutes. When taken to the hospital approximately two hours after the accident, defendant's body temperature was normal and he had no physical complaints, although he expressed his desire to have the victim's organs donated and her body immediately cremated.

Defendant's neck, however, was observed to be bruised and scratched, and the victim's body bore injuries that were both inflicted before her death and consistent with having been smothered after a struggle, rather than sustained in a low-impact automobile accident. Moreover, burdock burrs were found in the victim's hair and on her clothing, notwithstanding testimony that there were no burdocks near the portion of the lake surrounding the accident; in contrast, police recovered a damaged burdock bush at the couple's residence that had strands of the victim's hair on it. The victim's hair and pager—which she always carried—were also found in the bed of the pick-up truck when it was extracted from the lake. Finally, there was evidence that defendant had recently taken out a life insurance policy on himself and the victim, stood to gain a death benefit from the state retirement system if the victim died, had been physically violent with the victim, isolated her from her family, threatened to kill her, and had expressed his opinion that it would be easy to kill someone and make it look as though the person had drowned in Guilford Lake. We note that defendant did present evidence that the truck was driving closer to 40-45 miles per hour, that there were burdocks in the area of the accident, that the victim's injuries were consistent with an automobile accident, and that her death was caused by drowning. Nevertheless, "giv[ing] due deference to the factfinder's resolution of witness credibility and conflicting evidence," we conclude that, while a different verdict would not have been unreasonable, the jury gave the evidence the weight that it should have been accorded and was justified in finding defendant guilty beyond a reasonable doubt (*People v Romero*, 7 NY3d 633, 643 [2006]; *see People v Timmons*, 78 AD3d 1241, 1243-1244 [2010], *lv denied* 16 NY3d 833 [2011]; *People v Thibeault*, 73 AD3d 1237, 1239-1240 [2010], *lv denied* 15 NY3d 810 [2010], *cert denied* 562 US —, 131 S Ct 1691 [2011]; *People v Bierenbaum*, 301 AD2d 119, 131-140 [2002], *lv denied* 99 NY2d 626 [2003], *cert denied* 540 US 821 [2003]).

We agree with defendant, however, that reversal is nonetheless required because he received ineffective assistance of counsel. Specifically, counsel—without a reasonable strategy—(1) failed to join in the prosecutor's request that juror No. 5 be discharged for cause once it became clear that the juror had

committed misconduct in obtaining his seat on the jury, and (2) introduced evidence that this Court previously held to be unduly prejudicial, inadmissible hearsay.

With respect to the juror, when the names of potential witnesses were read during jury selection, juror No. 5 indicated that he knew Joyce Worden—defendant's paramour, who was also the baby-sitter for the couple's young children—as a patient in his podiatric medical practice. He expressly denied knowing any other witnesses. Juror No. 5 further maintained that he could be fair despite his prior professional relationship with Worden. He stated that he did not "even know much about the [first] trial," because he had recently moved to the area and had been busy with his medical practice and child-rearing at the time. He was then sworn as a juror and excused for the day.

During the lunch recess that immediately followed, the lead police investigator in the case, Lieutenant James Lloyd, informed the People that juror No. 5 had been interviewed by police at the time of the victim's death. The interview with Detective Gerald Parry—whose name was also read to juror No. 5 from the potential witness list and who ultimately testified at trial—was written up in the police lead sheet, which the People read into the record. The lead sheet indicated that juror No. 5 had informed police that he knew the victim, had worked with her at a hospital, had heard nurses discussing the victim's "problem with her husband," and referred police to other hospital employees who had further information about defendant's prior violent acts towards the victim. In response to this information, the People and County Court were indifferent regarding whether juror No. 5 should remain. Defense counsel, however, adamantly resisted the discharge of juror No. 5, stating: "I'm not going to pick a jury and have [Lieutenant] Lloyd decide he doesn't like somebody on the jury or he interviewed somebody . . . I don't want [Lieutenant] Lloyd to find out who the jurors are and then decide that he's not happy with one of them and come up with a reason to have that juror disqualified."

The next day, following completion of jury selection but before the jury was given preliminary instructions, defense counsel advised County Court that he had been contacted by Worden, who had been a witness for the defense during the first trial. Worden told counsel that juror No. 5 had a conflict inasmuch as, while treating her as a patient, he had asked her many questions about the case. Although defense counsel asserted that he liked jurors who asked questions and wanted juror No. 5 to remain on the jury, County Court became concerned that the juror had

not been forthright during voir dire. In addition, the People expressed grave doubts about the fitness of juror No. 5, stating that "his calling the police and being involved in the investigation and his failing to disclose that [fact] . . . has demonstrated that he is highly unqualified . . . to be a juror in this particular matter." Essentially, the People requested that the juror be dismissed for cause—as grossly unqualified under CPL 270.35 (1)—and claimed that they would have exercised a peremptory challenge against the juror had this information come to light when peremptory challenges remained available.[2]

During an in camera inquiry, juror No. 5 revealed that he had treated defendant's children after the first trial, but had not mentioned the relationship because the children were not named on the witness list. Although the juror initially indicated that he did not recall speaking to police about the case, he eventually admitted that he had been interviewed by Parry after the court informed him that the police lead sheets described the interview. The juror stated, however, that he had no "real affiliation with" the victim and had no information for police. In addition, the juror denied asking Worden questions about the case, explaining that she started to discuss it with him, but he steered the conversation back to her medical condition. The juror then swore that he could remain fair and impartial, and County Court did not discharge him.[3]

Defendant now argues that County Court committed reversible error in failing to dismiss juror No. 5 when it became clear that the juror was grossly unqualified under CPL 270.35 (1). Pursuant to that statute, "[a] sworn juror must be discharged when facts come to light, which were not known at the time the jury was empaneled, indicating that the juror is 'grossly unqualified to serve' " (*People v Harris*, 99 NY2d 202, 212 [2002], quoting CPL 270.35 [1]). In determining whether the sworn juror is "grossly unqualified," the court must, "[i]n a probing and tactful inquiry, . . . evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case" (*People v Buford*, 69 NY2d 290, 299 [1987]). This test is more stringent than that used in resolving a for-cause challenge. While, under CPL 270.20

---

2. Once a juror has been sworn, peremptory challenges are no longer available; a challenge for cause is permissible, but only before the first witness is sworn at trial and only "upon a ground not known to the challenging party" before the juror was sworn (CPL 270.15 [4]; *see People v Harris*, 57 NY2d 335, 349-350 [1982], *cert denied* 460 US 1047 [1983]).

3. It was subsequently discovered after trial that juror No. 5 also failed to reveal that another potential witness was counsel for the plaintiff in a medical malpractice action pending against the juror.

(1) (b), a challenge for cause is permissible when a prospective juror "has a state of mind that is *likely* to preclude him [or her] from rendering an impartial verdict based upon the evidence adduced at the trial" (emphasis added), a sworn juror may be discharged as grossly unqualified over a defendant's objection "only when it becomes *obvious* that [the] particular juror possesses a state of mind which would prevent the rendering of an impartial verdict" (*People v Buford*, 69 NY2d at 298 [internal quotation marks and citation omitted] [emphasis added]).

Although the People impliedly sought to advance a for-cause challenge to juror No. 5 under CPL 270.15 (4), defense counsel and County Court addressed only whether juror No. 5 should be discharged as "grossly unqualified" under CPL 270.35 (1).[4] In that regard, "a juror's concealment of any information during voir dire is [not] by itself cause for automatic reversal" of a refusal to discharge a sworn juror under CPL 270.35 (*People v Rodriguez*, 100 NY2d 30, 34 [2003]). In any event, defense counsel opposed removal of juror No. 5 pursuant to CPL 270.35 and, thus, defendant waived his present assertion that he was denied a fair trial due to the court's refusal to dismiss the juror as grossly unqualified under that provision (*see People v Hinton*, 302 AD2d 1008, 1009 [2003], *lv denied* 100 NY2d 539 [2003]; *cf. People v Garraway*, 9 AD3d 506, 506 [2004], *lvs denied* 3 NY3d 674, 740 [2004]).

In the alternative, defendant argues—and we agree—that he was denied the effective assistance of counsel due to defense counsel's refusal to consent to the removal of juror No. 5 for cause. Pursuant to CPL 270.15 (4), "[a] challenge for cause of a prospective juror which is not made before he [or she] is sworn as a trial juror shall be deemed to have been waived, except that such a challenge based upon a ground not known to the challenging party at that time may be made at any time before a witness is sworn at the trial." As relevant here, a juror may be challenged for cause when he or she "has a state of mind that is likely to preclude [the] rendering [of] an impartial verdict" (CPL 270.20 [1] [b]), as noted above. In addition, a for-cause challenge is permitted when a juror "bears some . . . relation-

---

4. The facts regarding the juror's police interview, professional relationship with the victim and knowledge of her marital problems—but not his questioning of Worden and treatment of defendant's children—came to light after the juror was sworn, but before he was empaneled. Nevertheless, the parties do not address the relevance of CPL 270.15 (3), which governs the discharge for incapacity of "juror[s] already sworn" "before twelve jurors are sworn" and, thus, we do not consider whether discharge was available "under the purportedly more narrow language in CPL 270.15" (*People v Wells*, 15 NY3d 927, 928, 930 [2010], *cert denied* 565 US —, 132 S Ct 123 [2011]).

ship" to the defendant, victim or a prospective witness at the trial "of such nature that it is likely to preclude him [or her] from rendering an impartial verdict" (CPL 270.20 [1] [c]).

With respect to the first ground, implicating a juror's state of mind, we note—as a general matter—when "prospective jurors unambiguously state that, despite preexisting opinions that might indicate bias, they will decide the case impartially and based on the evidence, the trial court has discretion to deny [a] challenge for cause if it determines that the juror's promise to be impartial is credible" (*People v Arnold*, 96 NY2d 358, 363 [2001]). The "mere words" or a "hollow incantation," however, are not sufficient; "[w]here there remains any doubt in the wake of such statements, when considered in the context of the juror's over-all responses, the prospective juror should be discharged for cause" (*People v Blyden*, 55 NY2d 73, 78 [1982]). Moreover, when the prospective juror's bias is based not upon a preexisting opinion as to the defendant's guilt of the crimes charged, but upon the defendant's over-all reputation or prior bad acts, "the evidence at trial might not address the basis of the juror's impression and thus may not alter this impression" (*People v Torpey*, 63 NY2d 361, 368 [1984]; *accord People v Johnson*, 94 NY2d 600, 614 [2000]). Under such circumstances, " 'the test for whether [the juror's] bias has been overcome by declarations is even stricter than where the juror has expressed an opinion as to the defendant's guilt . . . [T]he prospective juror should be dismissed if there appears to be *any possibility* that his [or her] impressions . . . might influence [the] verdict' " (*People v Johnson*, 94 NY2d at 614, quoting *People v Torpey*, 63 NY2d at 368).

Here, juror No. 5's bias appeared to arise from his knowledge of defendant's reputation for committing domestic violence against the victim. At the time that the People made their challenge for cause, counsel was aware that juror No. 5 claimed that he had moved to the area just prior to the victim's death and knew very little of the background of the case, when—in actuality—he had met and worked with the victim, indicated to police at the time of her death that he was aware of allegations that defendant had abused her, and referred police to other coworkers of the victim who had additional knowledge about defendant's acts of domestic violence against her. Inasmuch as the admissibility of evidence of defendant's prior abusive acts to the victim was a hotly contested issue at both of defendant's trials—and a basis for our reversal of defendant's first conviction (*People v Wlasiuk*, 32 AD3d 674, 676-678 [2006], *supra*)—we cannot say that the prospective juror's assurances of impartial-

ity dispelled the appearance of *"any possibility* that his impressions . . . might influence his verdict" (*People v Johnson*, 94 NY2d at 614 [internal quotation marks and citation omitted]).

Furthermore, while juror No. 5 revealed his professional relationship to Worden, it was evident that he had not disclosed his contact with an investigating officer who testified at trial, or his professional relationship with the victim as a coworker and her children as his patients, until he was confronted by the trial court. In addition, Worden's description of the nature of his contact with her differed from that of juror No. 5, and she informed defense counsel that the juror had a conflict based upon his questioning of her. These relationships, taken together, are indicative of "far more than a 'nodding acquaintance' " (*People v Littebrant*, 55 AD3d 1151, 1154 [2008], *lv denied* 12 NY3d 818 [2009], quoting *People v Provenzano*, 50 NY2d 420, 425 [1980]). Rather, they implicate the challenge for-cause ground set forth in CPL 270.20 (1) (c) because they "indicate[ ] an 'implied bias' which would likely . . . preclude[ ] the juror from rendering an impartial verdict" (*People v Meyer*, 78 AD2d 662, 664 [1980]; *see People v Furey*, 18 NY3d 284, 287 [2011]; *People v Rentz*, 67 NY2d 829, 830-831 [1986]; *People v Branch*, 46 NY2d 645, 650-651 [1979]). When such a showing of implied bias has been made, a prospective juror's declarations of impartiality, such as those made by juror No. 5, are ineffective (*see People v Furey*, 18 NY3d at 287; *People v Rentz*, 67 NY2d at 831; *People v Branch*, 46 NY2d at 651).

In sum, evidence of the juror's actual and implied bias "cast serious doubt on [his] ability to render a fair verdict under the proper legal standards" (*People v Bludson*, 97 NY2d 644, 646 [2001]). Given the "evidence that this particular . . . juror would not have been impartial" (*People v Colon*, 71 NY2d 410, 418-419 [1988], *cert denied* 487 US 1239 [1988]), we conclude that defense counsel's strategy in opposing the removal of juror No. 5 for cause "fell short of an objective standard of reasonableness" and denied defendant a fair trial (*People v Turner*, 5 NY3d 476, 485 [2005]; *accord People v Rivera*, 45 AD3d 1249, 1251 [2007], *lv denied* 10 NY3d 770 [2008]).

Moreover, while the failure to challenge a prospective juror for cause generally does not, in itself, constitute ineffective assistance of counsel (*see People v Turck*, 305 AD2d 1072, 1073 [2003], *lv denied* 100 NY2d 566 [2003]), defense counsel further erred in consenting to the jury's consideration of exhibit RRRR, without a limiting instruction. That exhibit, an evidence log created by police, contained a description of the victim's diary

entries expressing her fear that defendant might seriously injure or kill her, as well as her dissatisfaction with defendant's sexual relationship with Worden. This Court previously held that the diary entries were inadmissible hearsay that was highly prejudicial to defendant (*People v Wlasiuk*, 32 AD3d at 678-679). Although the description of the diary's content in the evidence log added yet another layer of hearsay, it was defense counsel who offered the logs to show the contents of the victim's pockets and as proof that police mishandled evidence in the case. The admission of the police logs themselves for that limited purpose may have been a matter of strategy, but the reference to the content of the diary entries remains inadmissible hearsay and the failure to redact the police logs constituted error (*see id.*).

Moreover, in response to a jury note asking if the diary entries could be considered as evidence, defense counsel failed to request any limiting instruction, stating, "Yeah, they can have it. It's evidence." Less than 10 minutes later, the jury reached its verdict. Certain jurors subsequently revealed that they switched their votes to guilty based upon the diary entries—indeed juror No. 5 gave television interviews explaining that he convinced "three holdouts" to vote guilty based upon the diary entries—and defense counsel conceded that he should have requested a limiting instruction. In our view, the submission of the diary entries without limiting instructions "seriously impinged upon defendant's right to a fair trial" (*People v Greene*, 306 AD2d 639, 643 [2003], *lv denied* 100 NY2d 594 [2003] [internal quotation marks and citation omitted]; *accord People v Montgomery*, 22 AD3d 960, 963 [2005]), further depriving him of the effective assistance of counsel.

Many of defendant's remaining arguments are rendered academic by our determination that a new trial is required herein. We have considered and rejected as meritless his assertions that County Court improperly denied his motions to suppress evidence and to dismiss the indictment.

Malone Jr., Kavanagh, McCarthy and Egan Jr., JJ., concur. Ordered that the judgment is reversed, on the law, and matter remitted to the County Court of Chenango County for further proceedings not inconsistent with this Court's decision.