*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  April 2, 2015                    105770
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v
                                        MEMORANDUM AND ORDER

JEREMIAH HAMILTON, Also Known
    as KELLAN BROWN, Also Known
    as HAVOC,
                        Appellant.
_____


Calendar Date:  February 11, 2015

Before:  Peters, P.J., Garry, Rose and Lynch, JJ.

                    _____


        Cynthia Feathers, Glens Falls, for appellant.

        Robert M. Carney, District Attorney, Schenectady (Peter
Willis of counsel), for respondent.

                    _____


Garry, J.

        Appeal from a judgment of the County Court of Schenectady
County (Drago, J.), rendered October 24, 2012, upon a verdict
convicting defendant of the crimes of murder in the second
degree, attempted murder in the second degree, criminal
possession of a weapon in the second degree (two counts) and
reckless endangerment in the first degree.

        In September 2008, the victim was shot and killed in the
City of Schenectady, Schenectady County while standing close to
an individual with whom defendant had quarreled earlier that day.
Defendant was indicted on charges of murder in the second degree,
attempted murder in the second degree, criminal possession of a

weapon in the second degree (two counts) and reckless endangerment in the first degree.  Following a jury trial, he was convicted as charged and sentenced to an aggregate prison term of 40 years to life, plus five years of postrelease supervision. Defendant appeals.

Defendant contends that his convictions for murder in the second degree and attempted murder in the second degree are not supported by legally sufficient evidence and are against the weight of the evidence.  To convict defendant of murder in the second degree, the People were required to prove that "[w]ith intent to cause the death of another person, he cause[d] the death of such person or of a third person" (Penal Law § 125.25 [1]).  The conviction for attempted murder in the second degree required proof that "with the intent to cause the death of another person, [defendant] engage[d] in conduct which tend[ed] to effect commission of that crime" (People v Fernandez, 88 NY2d 777, 783 [1996]; see Penal Law §§ 110.00, 125.25 [1]).

Taken together, the trial testimony of multiple witnesses established that a dispute erupted between defendant and Victor Toomer while they were playing dice in the street with several other men.  Defendant allegedly exclaimed, "You cheated me" and punched Toomer.  Defendant was chased down the street by Toomer and the other men and escaped, warning that he would be back. Defendant went to a house in an adjoining neighborhood, where he asked for a gun, stating that "somebody around the corner was trying to play him" and that he was "going to go over there and take care of it."  An alleged leader of the Bloods gang directed another man to give defendant the gun and directed the victim to accompany defendant when he returned to the street where Toomer was, to "make sure he was all right."  When they returned to the scene of the dice game, the victim — who had a friendly relationship with Toomer — crossed the street and began speaking with him, trying to mediate the dispute.  Meanwhile, defendant remained on the other side of the street and, according to Toomer's testimony, "[took] cover behind [a] car."  Toomer and the victim stood close together as they were speaking, and Toomer asked the victim what he was there to do.  The victim responded, "I didn't know it was you," and said that he wanted to settle the disagreement.  Toomer then saw defendant "duck a little bit under

the car" and then "come over the car and start[] shooting." Witnesses heard several gunshots. One witness saw defendant "crouch down" behind the car just before the gunshots rang out, and another saw defendant fire the gun. The victim was struck in the head by a bullet and fell to the ground. Toomer removed a gun from the victim's waistband and fired at defendant, who fled. Defendant then allegedly returned to the house where he had obtained the gun and returned it to the owner after wiping it down. When asked about the victim's whereabouts, defendant allegedly claimed that he "ran the other way."

A detective who investigated the crime scene found two .25 caliber shell casings near a car across the street from the victim's body, as well as several .22 caliber casings closer to the body. He opined that the person who fired the .25 caliber weapon was standing near the car and across the street from the victim. Two days later, police stopped the man who had given defendant the gun for an unrelated infraction and found that he was carrying a .25 caliber handgun. Subsequent testing revealed that a bullet test-fired from this gun was consistent with the projectile found in the victim's head.

Defendant fled to Pennsylvania, where he was subsequently arrested. He told police that he was on the street where the victim was shot, but claimed that he was smoking marihuana with a friend and fled when he heard the gunshots. A woman who was dating defendant at the time of the shooting testified that he told her that he got into a dispute with another "kid" while playing dice, and that after defendant returned to the scene, the victim "got in the middle trying to play peacemaker." Defendant said that the other "kid" fired a gun at defendant, and he fired back and ran away. A witness who was incarcerated with defendant testified that he asked defendant whether he had shot the victim and defendant responded, "[C]ome on, like he shouldn't have been trying to play peacemaker in the process of me letting it go." The witness said that defendant made a shooting motion with his hand while he said "letting it go," and that defendant added that he "didn't mean for it to go down the way it [did]."

Defendant argues that the evidence establishes that his target was Toomer, not the victim, and that the People neither

proved that he intended to kill the victim, nor that he intended to kill — rather than frighten or injure — Toomer. However, under the doctrine of transferred intent, a defendant who intends to cause the death of one individual but instead causes the death of another, unintended victim bears the same criminal liability as that which would have resulted if the intended target had been killed (see People v Fernandez, 88 NY2d at 781-782; People v Molina, 79 AD3d 1371, 1373-1374 [2010], lv denied 16 NY3d 861 [2011]; People v Ballard, 38 AD3d 1001, 1003 [2007], lv denied 9 NY3d 840 [2007]). Further, the intent to kill may be inferred from the surrounding circumstances and a defendant's actions, "and indeed this may be the only way of proving intent in the typical case of criminal attempt" (People v Bracey, 41 NY2d 296, 301 [1977] [internal quotation marks and citation omitted]; see People v Johnson, 106 AD3d 1272, 1278 [2013], lvs denied 21 NY3d 1041, 1043, 1045, 1046 [2013]). Contrary to defendant's assertion, there is no legal inconsistency, in light of the evidence presented, with the jury finding defendant guilty of both murder for the death of the victim, based upon a theory of transferred intent, and attempted murder, based upon his intent to kill Toomer (see People v Casseus, 120 AD3d 828, 829 [2014]). Viewing the evidence in the light most favorable to the People, we find that the proof was legally sufficient to support defendant's convictions of these crimes (see People v Culpepper, 118 AD2d 866, 866 [1986], lv denied 68 NY2d 667 [1986]; see also People v Miller, 118 AD3d 1127, 1128 [2014], lv denied 24 NY3d 1086 [2014]; People v Siler, 288 AD2d 625, 626-627 [2001], lv denied 97 NY2d 709 [2002]). Further, according deference to the jury's credibility determinations and viewing the evidence in a neutral light, we find that the convictions were not against the weight of the evidence (see People v Casseus, 120 AD3d at 829; see also People v Williams, 124 AD3d 920, 921 [2015]).

We agree, however, with defendant's further claim that County Court committed reversible error by denying his challenge for cause to a juror who had personal and/or professional relationships with two investigators involved in the case. A challenge for cause must be granted if a juror "has a state of mind that is likely to preclude him [or her] from rendering an impartial verdict based upon the evidence adduced at the trial" (CPL 270.20 [1] [b]; accord People v Harris, 19 NY3d 679, 685

[2012]).

As to the first witness — an investigator in the District Attorney's office who later testified, albeit briefly, at trial — the potential juror stated that he knew the witness "quite well" and had previously worked for him in a small shop for two years. The juror stated that neither he nor the witness still worked for that business at the time of trial. Further, when asked whether anything about his relationship with this witness would affect his ability to be impartial, the juror responded, "[The witness] has told me a lot of information about different things that go on. I kind of have a strong feeling with [this witness] and I believe things he says. I hope it will not interfere with my judgment." The court did not inquire further about the juror's relationship with the witness.

The second witness was the lead investigator on defendant's case. The potential juror stated that he had known the witness for about seven years and also saw him frequently at a softball league, where the juror and the investigator each had close family members who played on the same team. When asked whether the relationship would affect the juror's ability to be fair, the juror answered that "he and I were talking the other day and he said please make them aware that you know me and that I am the lead investigator on th[e] case." The juror then stated that the relationship would not affect his judgment.

A juror whose relationship with a potential witness is so close "that it is likely to preclude him [or her] from rendering an impartial verdict" (CPL 270.20 [1] [c]) must be excused even if the juror states that he or she can be impartial, because "the risk of prejudice arising out of the close relationship . . . [is] so great that recital of an oath of impartiality could not convincingly dispel the taint" (People v Branch, 46 NY2d 645, 651 [1979]; see People v Wlasiuk, 90 AD3d 1405, 1412 [2011]). In determining whether a relationship is so close as to require disqualification, a court should consider factors "such as the frequency, recency or currency of the contact, whether it was direct contact, . . . the nature of the relationship as personal and/or professional . . . [and] any facet of the relationship likely to preclude the prospective juror from being impartial"

(People v Greenfield, 112 AD3d 1226, 1228-1229 [2013], lv denied 23 NY3d 1037 [2014]; see People v Furey, 18 NY3d 284, 287-288 [2011]).  As to the first witness, a former working relationship, without more, will not necessarily give rise to implied bias requiring disqualification (see People v Scott, 16 NY3d 589, 595 [2011]; People v Pickren, 284 AD2d 727, 727-728 [2001], lv denied 96 NY2d 923 [2001]).  Here, however, the juror described the relationship as more than merely professional; he stated that he knew the witness well, had discussed many subjects with him, had strong feelings about him and tended to believe him, and he volunteered that he was concerned as to whether the relationship would affect his judgment.  The juror's longstanding social relationship with the second witness was sufficiently close that the witness was aware that the juror had been called to jury duty on the case he had investigated, and sufficiently current that the juror and witness had spoken only a few days before the trial.  Thus, this relationship, like that with the first witness, "was far more than a 'nodding acquaintance'" (People v Littebrant, 55 AD3d 1151, 1154 [2008], lv denied 12 NY3d 818 [2009], quoting People v Provenzano, 50 NY2d 420, 425 [1980]).  Failure to excuse the juror could have "create[d] the perception that the accused might not receive a fair trial before an impartial finder of fact" (People v Furey, 18 NY3d at 287; accord People v Greenfield, 112 AD3d at 1230).  Accordingly, based upon these two relationships, defendant's challenge for cause should have been granted.  In light of this holding, defendant's remaining contention regarding the potential juror is academic.

Established precedent requires that we reach this conclusion.  It bears mention that, in doing so, we remain rather painfully aware of the many difficulties that trial courts encounter in the process of selecting juries, especially where, as here, the trial is lengthy and involves many witnesses. Nevertheless, because of the fundamental importance of the right to trial by an impartial jury, "the trial court should lean toward disqualifying a prospective juror of dubious impartiality, rather than testing the bounds of discretion by permitting such a juror to serve" (People v Branch, 46 NY2d at 651).  By erring on the side of disqualification, "[t]he worst the court will have done in most cases is to have replaced one impartial juror with another impartial juror" (People v Johnson, 94 NY2d 600, 616

[2000] [internal quotation marks and citation omitted]; see CPL 270.20 [1] [b]; [2]; People v Russell, 116 AD3d 1090, 1093 [2014]).  Defendant used a peremptory challenge to excuse the potential juror and later exhausted his peremptory challenges; thus, the denial of his challenge for cause was reversible error (see People v Petke, 125 AD3d 1103, ___, 2015 NY Slip Op 01489, *2-*3 [2015]; People v Young, 119 AD3d 970, 972 [2014]).

Peters, P.J., Rose and Lynch, JJ., concur.


ORDERED that the judgment is reversed, on the law, and matter remitted to the County Court of Schenectady County for a new trial.




ENTER:

Robert D. Mayberger
Clerk of the Court