People v Ellis (2018 NY Slip Op 08143)





People v Ellis


2018 NY Slip Op 08143


Decided on November 28, 2018


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 28, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

RUTH C. BALKIN, J.P.
BETSY BARROS
ANGELA G. IANNACCI
LINDA CHRISTOPHER, JJ.


2012-07219
 (Ind. No. 2224/10)

[*1]The People of the State of New York, respondent,
v
Robert Ellis, appellant.


Paul Skip Laisure, New York, NY (William Kastin of counsel), for appellant, and appellant pro se.
Richard A. Brown, District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, Nancy Fitzpatrick Talcott, Deborah E. Wassel, and Danielle O'Boyle of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Gregory Lasak, J.), rendered July 18, 2012, convicting him of attempted murder in the second degree, assault in the first degree (two counts), robbery in the first degree (two counts), criminal possession of a weapon in the second degree (two counts), and criminal possession of stolen property in the fifth degree, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is affirmed.
The defendant appeals from a judgment convicting him, inter alia, of the attempted second-degree murder, first-degree assault, and first-degree robbery of Carl Field. The defendant was prosecuted under a theory that he acted in concert with the codefendant, Dexter Bostic, who shot Field, and that the defendant drove the get-away car.
At the jury trial, a witness testified that on July 8, 2007, at about 3:30 a.m., while she was working as a prostitute on Sutphin Boulevard in Queens, the defendant picked her up in a Porsche, and they subsequently picked up Bostic. The witness further testified that Bostic had a black gun with a silencer, and that he and the defendant stated that they were looking for someone to rob. After the defendant and Bostic let the witness out of the car, she hurried down the street. Field and another witness testified that the Porsche came to a "screeching halt" on Sutphin Boulevard, and that Bostic got out of the vehicle and shot Field four times, hitting him in the leg. Bostic took Field's chain necklace before reentering the Porsche, which then sped away. The witness who had been riding with the defendant and Bostic testified that she heard the shots and phoned the defendant, who told her, "we just shot some[one]." The witness overheard Bostic in the background saying that they just "popped" someone. Phone records established that the witness made a 48-second call to the defendant shortly after the incident. The evidence at trial further established that Field underwent a seven-hour operation to put a metal rod into his knee, spent six months in a hospital, and could not walk for two years.
The defendant argues in his main brief on appeal that (1) he was denied his right to [*2]counsel of his choice, (2) his for-cause challenge to a prospective juror was improperly denied, (3) he was deprived of a fair trial because he was made to appear at voir dire and subsequent trial proceedings in prison clothing, (4) the Supreme Court improperly admitted into evidence his videotaped statement in violation of his right to counsel, and (5) the prosecutor's comments in summation deprived him of a fair trial.
The defendant contends that he was denied the right to his choice of counsel because the Supreme Court denied his request to appoint the 18-B attorney who represented him in an unrelated criminal case that had concluded two years prior. We agree with our dissenting colleague that this issue is not properly raised on direct appeal, but rather should be raised in a CPL 440.10 motion to vacate the judgment of conviction because the facts supporting the defendant's claim are dehors the record (see People v Jackson, 29 NY3d 18; People v Geritano, 158 AD3d 724).
The Supreme Court properly denied the defendant's for-cause challenge to a prospective juror who was a retired school security officer for the New York City Police Department (hereinafter NYPD). Coincidentally, this prospective juror's son had previously been excused as a prospective juror in this case because that son was an NYPD sergeant and knew two of the witnesses in the case. The son indicated in his voir dire that he would have a problem being fair, and he was excused on consent of both sides. However, upon voir dire questioning, the retired school security officer unequivocally stated that he could be impartial. After defense counsel challenged this prospective juror for cause, the court conducted its own questioning. The retired school security officer stated that he had not heard anything about the case, and that he had not and would not discuss the case with his son, and he reaffirmed that he could be fair and impartial (see People v Johnson, 94 NY2d 600; People v Culhane, 33 NY2d 90). Contrary to the defendant's contention and our dissenting colleague's conclusion, the mere fact that the retired school security officer was related to a prospective juror who was excused for cause does not establish an implicit bias (cf. People v Furey, 18 NY3d 284; People v Powell, 153 AD3d 1034; People v Guldi, 152 AD3d 540; People v Montford, 145 AD3d 1344; People v Bedard, 132 AD3d 1070; People v Hamilton, 127 AD3d 1243; People v Greenfield 112 AD3d 1226). Thus, the expurgatory oath of the retired school security officer was sufficient to establish his impartiality. There is no evidence in this record that the retired school security officer had a relationship with the defendant, the victim, a prospective witness, or counsel so as to support a claim of implicit bias (cf. People v Furey, 18 NY3d at 287).
Contrary to the conclusion of our dissenting colleague, the defendant's contention that he was deprived of a fair trial because he allegedly wore prison garb for 3 days of jury selection and more than 5 days of witness testimony during the 18-day trial is unpreserved for appellate review. At no point during jury selection or the first days of testimony did defense counsel or the defendant make an application to adjourn or object to the proceedings in order to obtain civilian clothes (see CPL 470.05[2]; Estelle v Williams, 425 US 501, People v Shaw, 126 AD3d 1016, 1017; People v Bullock, 28 AD3d 673, 673). In any event, the contention is without merit. While "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes" (Estelle v Williams, 425 US at 512), the record here establishes that the Supreme Court gave the defendant multiple pretrial adjournments during which he could have obtained civilian clothes, but he failed to do so. Further, the state-issued clothing that the defendant wore bore no markings indicating that it was prison clothing (see People v Johnston, 43 AD3d 1273; People v Everson, 262 AD2d 1059; People v Reid, 137 AD2d 844). Ultimately, the defendant was provided a civilian suit by his counsel, and there was no explanation as to why such clothing could not have been provided earlier in the proceedings.
The defendant correctly contends that his videotaped statement was improperly admitted in violation of his right to counsel (see People v Lopez, 16 NY3d 375; People v Borukhova, 89 AD3d 194). However, the admission of the defendant's statement constituted harmless error because the evidence of his guilt, without reference to the statement, was overwhelming, and there was no reasonable possibility that the jury would have acquitted him had it not been for the constitutional error (see People v Crimmins, 36 NY2d 230; People v Borukhova, 89 AD3d 194; People v Payne, 41 AD3d 512).
The defendant failed to preserve for appellate review his contention that certain of the prosecutor's summation comments deprived him of a fair trial (see CPL 470.05[2]). In any event, the prosecutor's remarks in summation, for the most part, constituted fair comment on the evidence and the inferences to be drawn therefrom (see People v Fuhrtz, 115 AD3d 760; People v Birot, 99 AD3d 933; People v Guevara-Carrero, 92 AD3d 693; People v McHarris, 297 AD2d 824, 825), or were fair response to defense counsel's comments during summation (see People v Adamo, 309 AD2d 808; People v Clark, 222 AD2d 446; People v Vaughn, 209 AD2d 459), and any improper statements "were not so flagrant or pervasive" as to deprive the defendant of a fair trial (People v Almonte, 23 AD3d 392, 394; see People v Svanberg, 293 AD2d 555).
Contrary to the defendant's contention, raised in his pro se supplemental brief, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620), there was legally sufficient evidence to establish the defendant's guilt of attempted murder in the second degree, assault in the first degree (two counts), robbery in the first degree (two counts), criminal possession of a weapon in the second degree (two counts), and criminal possession of stolen property in the fifth degree beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383; People v Bleakley, 69 NY2d 490). Upon reviewing the record here, we are satisfied that the verdict of guilt as to those crimes was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
Contrary to the defendant's further contention, raised in his pro se supplemental brief, the Supreme Court did not err in denying his motion for a missing witness charge, because the testimony of the subject witness would not have been material to the case (see People v Mamadou, 129 AD3d 993; People v Lopez, 19 AD3d 510; People v Rivera, 174 AD2d 581).
Contrary to the further contention raised in the defendant's pro se supplemental brief, the Supreme Court providently exercised its discretion in denying the defendant's motion for a mistrial after a witness made a brief reference to a police officer being shot, a charge for which the defendant was not being tried. "The decision to declare a mistrial rests with the sound discretion of the trial court, which is in the best position to determine if this drastic remedy is necessary to protect the defendant's right to a fair trial" (People v Redmon, 81 AD3d 752, 752 [internal quotation marks omitted]). Here, the court struck the improper testimony from the record and directed the jury to disregard it, thereby ameliorating any prejudice to the defendant resulting from the testimony (see People v Hicks, 84 AD3d 1402; People v Brescia, 41 AD3d 613; People v Brown, 290 AD2d 251).
The remaining contentions raised in the defendant's pro se supplemental brief are either based on matter dehors the record and, thus, not properly before this Court (see People v Ingram, 142 AD3d 676; People v Fully, 109 AD3d 936), or without merit (see People v Ingram, 142 AD3d 676).
BALKIN, J.P., IANNACCI and CHRISTOPHER, JJ., concur.
BARROS, J., dissents, and votes to reverse the judgment, on the law, and remit the matter to the Supreme Court, Queens County, for a new trial before a different Justice.
In 2007, the defendant, Robert Ellis, was arrested in relation to his alleged involvement in the shooting of Carl Field on July 8, 2007, in Queens, and the shooting of two police officers the next day, on July 9, 2007, in Brooklyn. In Kings County, the defendant, Dexter Bostic, and Lee Woods were charged with, inter alia, aggravated murder of Police Officer Russell Timoshenko and attempted murder of the other officer on July 9, 2007, in Brooklyn. By judgment rendered January 14, 2009, the Supreme Court, Kings County, upon a jury verdict, convicted the defendant of three counts of criminal possession of a weapon in the second degree. The defendant was acquitted of aggravated murder and attempted murder of the police officers. The codefendants, Bostic and Woods, were each convicted of aggravated murder.
In this Queens County case arising from the shooting of Field on July 8, 2007, the defendant was charged with attempted murder in the second degree, two counts of assault in the first degree, three counts of robbery in the first degree, robbery in the second degree, two counts of criminal possession of a weapon in the second degree, and criminal possession of stolen property in the fifth degree. The defendant was convicted, upon a jury verdict, of all the charges except one count of robbery in the first degree and the count of robbery in the second degree, which counts were dismissed before the Supreme Court submitted the charges to the jury. Bostic was charged on the same indictment and convicted of the same charges as the defendant.
I. Right to Counsel
At his arraignment on this Queens County case on October 27, 2010, the defendant requested that Danielle Eaddy be assigned to represent him since she represented him during the investigations for both the Queens County and Kings County matters, and during the Kings County trial. The defendant's then-assigned counsel, Michael Siff, argued as follows:
"MR. SIFF: Your Honor, . . . [the defendant] was represented by . . . Ms. E[a]ddy, in Brooklyn on the proceedings . . . last year . . . for which he did receive a conviction for a weapons charge only. He is asking that the Court appoint her to represent him. That's who he prefers. He, in fact, indicated that she was representing him when they pulled him out for different line-ups and other investigative matters and he feels since she was involved in that aspect of the case, she is very well versed with everything that was going on. Apparently, some witnesses that are in this matter . . . testified in the Brooklyn matter. So he would feel more comfortable if the Court could assign her.
"THE COURT: You want to hire her?
"DEFENDANT: Can't afford it.
"THE COURT: All right. Mr. Siff is assigned pursuant to 18B of the County Law. Application to have this other attorney represent you is denied."
By the time of jury selection, Siff was no longer representing the defendant. At jury selection, the defendant's assigned counsel, Dennis Coppin, declined to adopt the defendant's pro se motion which sought to have Eaddy substituted for Coppin as defense counsel. Coppin noted, however, that Eaddy had represented the defendant during the lineups relating to the instant case. The written pro se motion stated that Eaddy represented the defendant during lineups, and that she previously cross-examined the "same witnesses at [his] previous trial." The defendant argued that given Eaddy's familiarity with the case, any delay in appointing her would be minimal, and that "[i]n the past she has indicated that if she is assigned to this case she is ready and willing to take the assignment." The Supreme Court responded that Eaddy was "some attorney that [it had] never heard of," and that the defendant's request was "just another dilatory tactic." The court further noted Coppin's work on the case, and denied the defendant's request to substitute Eaddy as his counsel.
"An indigent defendant's constitutional right to the assistance of counsel is not to be equated with a right to choice of assigned counsel'" (People v Espinal, 10 AD3d 326, 329, quoting People v Sawyer, 57 NY2d 12, 18-19; see People v Porto, 16 NY3d 93, 99). "[H]owever, that distinction is significantly narrowed once an attorney-client relationship is established'" (People v Espinal, 10 AD3d at 329, quoting People v Childs, 247 AD2d 319, 325; see People v Knowles, 88 NY2d 763, 766-767; People v Hall, 46 NY2d 873, 875). "[O]nce an attorney-client relationship has been formed between assigned counsel and an indigent defendant, the defendant enjoys a right to [*3]continue to be represented by that attorney as counsel of his [or her] own choosing" (People v Griffin, 92 AD3d 1, 5, affd 20 NY3d 626; see People v Espinal, 10 AD3d at 329; see also People v Arroyave, 49 NY2d 264, 270). Courts have recognized that the right of a defendant to be represented at trial by counsel of his or her own choosing serves critical needs, including the "need for a defendant to be willing to confide freely and fully in his [or her] attorney so that the channels of communication and advice between counsel and his [or her] client may remain free-flowing and unobstructed," as well as the considerations that "[m]utual cooperation between defendant and counsel is often times a critical prerequisite to effective legal representation," and that "the accused is more likely to harbor a feeling that his [or her] presumed innocence and individual rights were scrupulously protected at trial" (People v Arroyave, 49 NY2d at 270).
"While the right to counsel of choice is qualified, and may cede, under certain circumstances, to concerns of the efficient administration of the criminal justice system, [the Court of Appeals has] made clear that courts cannot arbitrarily interfere with the attorney-client relationship, and interference with that relationship for purpose of case management is not without limits, and is subject to scrutiny" (People v Griffin, 20 NY3d 626, 630). "[A] court commits reversible error where it interferes with an established attorney-client relationship without making threshold findings that [the attorney's] participation would have delayed or disrupted the proceedings, created any conflict of interest, or resulted in prejudice to the prosecution or the defense'" (People v Espinal, 10 AD3d at 329, quoting People v Knowles, 88 NY2d at 767).
The defendant's claim that the Supreme Court interfered with an established attorney-client relationship by failing to assign Eaddy to represent him is different than the more common scenario where the court has discharged an indigent defendant's assigned counsel (see People v Griffin, 92 AD3d 1; People v Espinal, 10 AD3d 326; People v Childs, 247 AD2d 319; see also People v Hall, 46 NY2d 873). Even so, given the facts of this case, including that Eaddy represented the defendant during intertwined investigations of both the Kings County and Queens County cases and at trial in the Kings County case, the same principles apply in determining whether the court improperly interfered with an established attorney-client relationship.
Since the Supreme Court was informed at the time of arraignment in Queens County that the defendant had established an attorney-client relationship with Eaddy in both the Kings County and Queens County cases, it was incumbent upon the court to assign her as counsel unless she was not ready, willing, or able to accept the assignment (see People v Jackson, 216 AD2d 323, 324 [stating that a court should not interfere with an established attorney-client relationship "where, as here, counsel was also representing the defendant on a number of other pending criminal matters"]). At the time of arraignment, there was no risk that Eaddy's participation would have delayed or disrupted the proceedings, created any conflict of interest, or resulted in prejudice to the prosecution or the defense. To the contrary, Eaddy's familiarity with the defendant and the case, as well as the defendant's preference for her as his assigned counsel, would most likely have expedited matters. Indeed, the attorney who was assigned to represent the defendant at the arraignment, Siff, was eventually discharged in March 2011 and replaced with Coppin, with whom the defendant expressed dissatisfaction and requested further substitution.
Instead of inquiring as to Eaddy's availability at the time of arraignment, the Supreme Court summarily denied the defendant's request for the constitutionally impermissible reason that the defendant was too indigent to pay for her services (see generally Gideon v Wainright, 372 US 335; People v Price, 262 NY 410).
Despite the Supreme Court's error in failing to make proper inquiry regarding defendant's request to maintain his attorney-client relationship with Eaddy, the defendant's claim that the court violated his right to counsel of his own choosing cannot be reviewed on direct appeal for the simple reason that the record discloses no information as to whether Eaddy was ready, willing, and able to accept the assignment. Although the defendant suggested in his pro se motion made during jury selection that Eaddy had earlier expressed her willingness to take the assignment, there is nothing in the record from Eaddy to either corroborate the defendant's assertion, or to otherwise suggest that she was available to represent the defendant on the scheduled trial date. Since [*4]any such information would be based on matter dehors the record, the defendant's contention cannot be reviewed on direct appeal. In the event that such information exists, the appropriate vehicle to review the defendant's allegation that the court violated his right to counsel of his own choosing would be a motion pursuant to CPL 440.10 (see People v Fisher, 121 AD3d 1013, 1014; People v Folger, 110 AD3d 736, 736).
II. Presumption of Innocence
The defendant was deprived of a fair trial because he was compelled to wear the same prison clothing for three days of jury selection and more than five days of trial testimony (see Estelle v Williams, 425 US 501).
On May 10, 2012, which was the scheduled date for jury selection, the defendant fainted as a result of not receiving his prescribed medication. After inquiring about his condition, the Supreme Court asked the defendant, "Do you have any civilian clothes?" The defendant replied, "No." When the court asked if his family brought him any clothing, the defendant explained that his family was out of state attending to an emergency. The defendant further stated that he did not have any civilian clothes in the facility where he was being held, but that he "can get clothes." The court then stated as follows: "All right. The clothing you are wearing right now [there] is no indication on those cloth[es]; there is no writing at all on that thing you are wearing right now. You look pretty good to me" (emphasis added). The court adjourned the proceedings to allow the defendant to be medically examined or obtain his medication.
On the adjourned date, May 14, 2012, defense counsel indicated that the defendant had made a pro se motion, which counsel did not adopt, seeking, inter alia, the Supreme Court's recusal and substitution of counsel, and raising an issue regarding the presence of uniformed police officers during the trial and their influence upon the jury. As part of that pro se motion, defense counsel stated that the defendant had a "complaint" that "he has a jumpsuit on" and did not have "a suit for the jury." Counsel stated that the defendant has an "upstate green jacket that he has from the jail in Downstate." Despite his client's protest, the defense attorney stated that he was prepared to go forward with jury selection. The court noted that "the clothing . . . has no indication that it's from the Department of Corrections," that "there is no lettering on there," and that it was "just a plain jumpsuit." The court also noted that the outfit was green and "not orange." The court then clarified that the defendant's outfit was not a jumpsuit, but rather "a shirt and pants." The defendant asked if he could make a record regarding his objections, but the court refused to allow further argument, telling the defendant to "talk to [his] attorney about that." Thereafter, the court called the prospective jurors into the courtroom for jury selection.
Jury selection proceeded on May 14, 15, and 16 with the defendant wearing the same prison clothing. After the jury was selected, the defendant wore the same prison clothing for opening statements and testimony on May 16, and for witness testimony on May 17. On May 21, the next trial date, the following colloquy took place:
"THE COURT: Mr. Ellis, how is everything?
"DEFENDANT: Not much better. My clothes are still dirty. I got clean underclothes, but everything else is still dirty.
"THE COURT: You have clean underclothes?
"DEFENDANT: Yeah. That's it."
The Supreme Court then asked the prosecutor if he was ready to proceed. The defendant wore the same prison clothing on May 21, 22, 23, and 24, during which time nine witnesses testified. Finally, on May 29, the defendant appeared in a civilian suit. Defense counsel told the court that he had provided the suit for his client. The court informed counsel that "the [*5]Department of Correction would not allow [the defendant] to [wear] it because of its color," and that it "instructed the court officers that they were to put the suit on him in the pens here so he has a suit on."
"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law" (Coffin v United States, 156 US 432, 453; see Estelle v Williams, 425 US at 503). A defendant is "entitled to appear in court with the dignity and the self-respect of a free and innocent [person]" (People v Roman, 35 NY2d 978, 979). Presenting an accused before the jury in prison attire, which is a continuing visual communication to the jury that the accused requires incarceration, impairs the presumption of innocence, and operates usually against only indigent defendants, which is "repugnant to the concept of equal justice embodied in the Fourteenth Amendment" (Estelle v Williams, 425 US at 505-506; see People v Then, 28 NY3d 1170, 1172; People v Roman, 35 NY2d at 979).
"[A]lthough the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation" (Estelle v Williams, 425 US at 512-513).
Here, the defendant objected to wearing prison garb at jury selection as early as May 14, 2012, and then, when given an opportunity, the defendant again protested that his prison clothing was dirty on May 21, 2012. Thus, the defendant's complaints about his clothing were sufficient to preserve his claim for appellate review.
Contrary to the Supreme Court's suggestion, there is no rule that clothing constitutes identifiable prison garb only if it is orange, a jumpsuit, or has markings or writing on it indicating that the defendant is a prisoner. This case is readily distinguishable from People v Then (28 NY3d 1170), where the defendant's orange correctional pants were purposefully hidden from the jury during a short span of time, and where the black knitted top worn by the defendant was clearly not identifiable as correctional garb (id. at 1171-1172). In stark contrast to the facts of this case, the trial court in Then stated that it understood the defendant's concerns, made a concerted effort to conceal the defendant's orange pants from the jury, and arranged for civilian clothes to be delivered to the defendant for the next day (id. at 1171-1172). This case is also distinguishable from cases where the clothing worn by the accused was deemed not to be identifiable prison garb (cf. People v McFarlane, 96 AD3d 879; People v Johnson, 43 AD3d 1273).
Here, there is no question that the clothing worn by the defendant was prison-issued clothing. The defendant wore the same green top and bottom for three days of jury selection and more than five days of trial testimony. Even the Supreme Court described the defendant's clothing as "that thing." Based upon the description of the clothes and the fact that the defendant wore the same clothes for at least eight days, a reasonable juror could only conclude that the clothing was prison garb. Given the defendant's objection to wearing dirty prison clothes, I conclude that he preserved his contention for appellate review, and that, as a matter of law, he was deprived of a fair trial (see Estelle v Williams, 425 US 501).
III. Right to an Impartial Jury
The judgment of conviction should also be reversed because the Supreme Court erred in denying the defendant's for-cause challenge to a prospective juror. During the third round of jury selection, the panel of prospective jurors included a father and a son. The son was a sergeant in the New York City Police Department (hereinafter NYPD) and worked in a crime laboratory. He acknowledged knowing two of the police criminalists who had testified in the Kings County case and were expected to testify in this case. When asked if he would have a problem sitting as a "fair juror," the son replied, "I think everyone would agree. I don't think you guys would pick me." The son was excused with the consent of both counsel.
The father reported that he was a retired school safety agent employed by the NYPD for 15 years. He acknowledged that his fellow juror son was a sergeant in the NYPD, and that he had a brother who was a retired detective in the NYPD. When asked if he could be fair despite his employment and familial connections to the NYPD, the father responded, "I think so." He assured the Supreme Court that he did not discuss the case with his son and would not do so, and that he would not credit a police officer's testimony more than any other witness's testimony.
The defendant challenged the father for cause. His counsel argued, inter alia, as follows: "I am raising a cause challenge against him because it is my opinion that to have him on this jury is very unfair to [the defendant]. I realize we did run out of challenges, but this case, I assume, will get some attention at some point. There will be police officers in the audience at some point based on flyers that I have seen . . . [indicating] that they plan on attending and the parents of this [slain] officer, which is their absolute right to attend. Bottom line is with this person being left on the jury . . . I feel that his ability to judge this case fairly and impartially as time goes on and based on his background and his connection to his son, it is his son who supervises . . . two important witnesses in this case. I am objecting."
"A basic premise of our criminal justice system is that a defendant has the right to trial by an impartial jury" (People v Arnold, 96 NY2d 368, 360; see People v Branch, 46 NY2d 645, 652 ["Nothing is more basic to the criminal process than the right of an accused to a trial by an impartial jury"]). CPL 270.20(1)(c) permits, inter alia, a challenge for cause to a prospective juror on the ground that the prospective juror has a preexisting relationship to the defendant, the victim, a prospective witness, or counsel that "is likely to preclude him [or her] from rendering an impartial verdict" (see People v Furey, 18 NY3d 284, 287). "This is referred to colloquially as an implied bias' that requires automatic exclusion from jury service regardless of whether the prospective juror declares that the relationship will not affect [his or her] ability to be fair and impartial" (id. at 287 [citation omitted]; see People v Rentz, 67 NY2d 829, 831; People v Branch, 46 NY2d at 650). Such bias "cannot be cured with an expurgatory oath" because the risk of prejudice arising out of the relationship itself is so great that it "creates the perception that the accused might not receive a fair trial before an impartial finder of fact" (People v Furey, 18 NY3d at 287; see People v Branch, 46 NY2d at 651).
Thus, the Court of Appeals has "advised trial courts to exercise caution in these situations by leaning toward disqualifying a prospective juror of dubious impartiality'" (People v Furey, 18 NY3d at 287, quoting People v Branch, 46 NY2d at 651), rather than "testing the bounds of discretion by permitting such a juror to serve" (People v Branch, 46 NY2d at 651). In determining whether a prospective juror's relationship with potential witnesses or interested party requires disqualification for cause as a matter of law, the court should evaluate the frequency of contact and nature of the relationships (see People v Furey, 18 NY3d at 287; People v Rentz, 67 NY2d at 830).
In the exercise of caution, the Supreme Court should have granted the defendant's for-cause challenge to the prospective juror. This trial followed a Kings County trial in which the defendant had been acquitted of murder and attempted murder arising from the shooting of two NYPD officers, one of whom was killed. Given the close temporal proximity of the criminal conduct underlying both cases, the investigations were intertwined, and it was expected that both trials would involve many of the same witnesses. The trials of both cases were well publicized. Uniformed police officers and the family of the slain officer were expected to be in attendance in this trial as they had been in the Kings County case. Indeed, defense counsel informed the court that he observed flyers urging uniformed police officers to attend the subject trial. The prospective juror's son, a sergeant in the NYPD, acknowledged his work relationship with two NYPD criminalists who testified in the Kings County case and were expected to testify in this case. The prospective juror himself was a retired employee of the NYPD, and his brother was a retired detective in the NYPD.
Given all of the circumstances, including (1) the prospective juror's employment and familial relationships with the NYPD, (2) the allegations in the Kings County case that the defendant was involved in the shooting death of an NYPD officer and the attempted murder of another police [*6]officer, and (3) that the prospective juror's son, in effect, disqualified himself based upon his working relationship with two criminalists who were expected to testify in this trial, it should have been apparent that seating the prospective juror would create "the perception that the accused might not receive a fair trial before an impartial finder of fact" (People v Furey, 18 NY3d at 287; see People v Branch, 46 NY2d at 651; People v Montford, 145 AD3d 1344, 1348).
Since the defense had exhausted its peremptory challenges, the Supreme Court's erroneous denial of the defendant's challenge for cause constitutes reversible error (see CPL 270.20[2]; People v Hamilton, 127 AD3d 1243, 1247).
IV. Summary
Although the Supreme Court erred in failing to conduct a proper inquiry with respect to the defendant's request to have Eaddy assigned to represent him, the defendant's claim that his right to counsel of his own choosing was violated cannot be reviewed on direct appeal since the record discloses no information that Eaddy was ready, willing, and able to represent him.
Nonetheless, the presumption of innocense was impaired when the Supreme Court compelled the defendant to appear before the jury in prison garb, and the court deprived the defendant of his right to an impartial jury by erroneously denying his challenge for cause to a prospective juror. The court's dismissive treatment of the defendant's aforementioned concerns and the cursory denial of his objections lead me to the conclusion that not only was the defendant deprived of a fair trial, but that he should be tried again before a different Justice. "The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (People v Crimmins, 36 NY2d 230, 238).
Accordingly, I vote to reverse the judgment, on the law, and remit the matter to the Supreme Court, Queens County, for a new trial before a different Justice.
ENTER:
Aprilanne Agostino
Clerk of the Court